**NASHUA CORPORATION**

v.

**RCA CORPORATION.**

**Civ. A. No. 2948.**

United States District Court
D. New Hampshire.
Dec. 19, 1969.

Joseph M. Kerrigan, Hamblett, Kerrigan, LaTourette & Lopez, Nashua, N. H., L. William Bertelsen, Kenway, Jenney & Hildreth, Boston, Mass., for plaintiff.

Sherman D. Horton, Jr., Sullivan, Gregg & Horton, Nashua, N. H., William K. Kerr, Fish, Richardson & Neave, New York, N. Y., for defendant.

OPINION

BOWNES, District Judge.

This patent case was initiated by the Nashua Corporation on December 31, 1968, as a suit for a declaratory judgment raising the issues of the validity and infringement of RCA Corporation's Patent No. 3,052,540 [hereinafter 540]. The complaint also alleged a claim for a refund of royalties paid to RCA by Nashua pursuant to a license agreement under the patent.

Jurisdiction is based on the subject matter of the action and venue is located in this court by virtue of the fact that Nashua Corporation is a Delaware Corporation with a principal place of business in Nashua, New Hampshire, and the defendant, RCA, is also a Delaware Corporation with a principal place of business in New York City, licensed to do business in the State of New Hampshire.

## THE ISSUES

The overall issues are:

(1) The validity of RCA's 540 Patent;

(2) Nashua's infringement of claims 1 to 5, 7, and 8 of the patent; and

(3) Nashua's right to recoup from RCA royalties already paid by Nashua to RCA pursuant to a license agreement between the parties.

The determination of these issues centers on Nashua's claims that the patent is invalid because the differences between the subject matter and the prior art are such that the subject matter as a whole would have been obvious to an ordinary skilled chemist at the time the invention was made, 35 U.S.C. § 103 (1964); that RCA perpetrated a fraud upon the Patent Office in order to obtain the issue of the patent; and that the alleged inventor, Harold Greig, did not invent the patent.

## EXPLANATION OF ELECTRO-PHOTOGRAPHY

The patent in suit is entitled "Dye Sensitization of Electrophotographic Materials" and relates to the electrophotographic system of office copying invented by Harold Greig and other RCA employees, and identified by the RCA trademark "Electrofax." In order to understand the issues in the case, some explanation of electrophotography is necessary. Electrophotography is but one of several methods used today for reproducing documents quickly and cheaply. The electrophotographic method of reproducing documents is based on the use of a material having two different electrical characteristics. One of these necessary attributes is denoted "photoconductivity" which means that the electrical conductivity (i. e., the ability to conduct an electrical current) increases when the material is exposed to light. The other essential electrical characteristic is that the material not be electrically conductive when in the dark. Or to put it another way, the material when not exposed to light must be highly insulating and retain an electrical charge. This characteristic is referred to as "high dark resistivity."

In electrophotography, the photoconductive-insulating material is usually a thin homogeneous layer of the material alone or a thin layer consisting of a dispersion of fine particles of the photoconductive material in a plastic film. The material in either form is known as an electrophotographic layer and is commonly coated on a metal or paper backing.

There are four basic steps to making copies of documents by the electrophotographic method. In the first step, the surface of the electrophotographic layer is subjected in darkness to a blanket electrostatic charge. An electrostatic charge is a stationary electric charge as opposed to a moving charge such as the current in a power transmission line. A corona charging device provides the overall electrostatic charge to the surface of the layer. Since the layer has high dark resistivity, the charge is not conducted away, but is retained on the surface of the layer and remains there until the layer is exposed to light.

In the second step, the layer, which has now been electrostatically charged, is exposed to the document to be copied. Exposure is commonly effected by either shining light through the original document or reflecting light from it. The light shines through or is reflected from only the blank parts of the document. The electrostatic charge is conducted away from those areas of the electrophotographic layer that the light strikes. As a result, there is produced on the surface of the electrophotographic layer

an invisible electrostatic pattern consisting of those areas which have retained the charge and the other areas from which the charge has been conducted away. The charged areas correspond to the typewritten or printed marks on the original documents; the uncharged areas correspond to the light transmitting or reflecting (blank) areas of the original. This invisible pattern of electrostatically charged and uncharged areas is referred to as the "latent image."

The third step in the process is to make the latent image visible. Since the latent image is defined and outlined by the charged and uncharged areas on the surface of the layer, it is made visible by submitting it to contact with a developer or toner. The developer (or toner) consists of small colored or black particles which are attracted electrically to the charged areas of the layer. Since the charged areas of the layer correspond to the typewritten or printed marks on the original document, the result is a visible reproduction of it upon the surface of the electrophotographic layer.

The fourth or final step in the electrophotographic reproduction process is to fix the pattern that has been developed and make it permanent. This is done by subjecting the layer to a heat source which fuses the developer (or toner) to the backing. This entire process, of course, takes place in a very short period of time and is carried on within a machine known commonly as a copying machine. While not important to the decision in this case, it might be well to point out that the essential difference between the process herein described and the so-called "Xerox" process is that in the "Xerox" process the elec-trophotographic layer is on the surface of a metal drum and the image is transferred from the drum via the electrophotographic layer to ordinary paper. In the "Electrofax" process, the paper which is used has been coated with the electrophotographic layer and it receives the image directly from the original.

Patent 540 cannot be understood nor its claims evaluated without some discussion of RCA Patent 3,052,539 [hereinafter 539], filed October 1, 1953, and issued the same day as the patent in suit, September 4, 1962.

The 539 Patent was also invented by Greig. The 539 Patent teaches, in effect, that the use of white zinc oxide crystals interposed in a binder,[1] as the basic component of the electrophotographic layer, results in a very effective combination of photoconductivity and high dark resistivity. Since white zinc oxide is commercially available and is relatively inexpensive, its usefulness in the "Electrofax" process is apparent. The use of white zinc oxide in a binder, however, had one serious drawback. It was photoconductive only when exposed to ultra-violet light which is beyond the range of the visible spectrum. This limitation drastically curtailed the commercial usefulness of white zinc oxide in a binder in electrophotography. Testimony of Dr. Ross, Record, Vol. 1, at 44–46. In order, therefore, for the white zinc oxide layer to be commercially valuable, some method had to be devised to make the white zinc oxide crystals effective when exposed to light from the visible spectrum, which is the light one sees from an ordinary light bulb. Or to put it more scientifically, the spectral response of the white zinc oxide crystals had to be broadened so that they would

---

[1] The binder is the material in which the white zinc oxide is interposed. After the white zinc oxide is added to it, it is coated on the paper and forms the electrostatic layer. This binder must be an electrically insulating, film forming material. Examples of binders are: synthetic resins, natural resins, and waxes. In addition to being electrically insulating and film forming, the binder must be water-insoluble and should be sufficiently flexible, when in the form of a thin film, to be practical as a coating for paper. The binder is an essential part of the composition, because without it the zinc oxide does not exhibit the properties necessary for successful electrophotography.

be photoconductive in the visible as well as the ultra-violet spectrum.

The 540 Patent claims the invention of various recording elements (electrophotographic layers) with a broader spectral response than plain white zinc oxide due to the addition of dye sensitizers. Although the 540 Patent does not claim the process of adding these dye sensitizers (dye sensitization), it is necessary to explain it for an understanding of this opinion. The essential part of this process is the adsorption of organic dye on the surface of the white zinc oxide crystals.[2] The adsorption is effected in any of three ways: by staining the white zinc oxide particles with the dye before mixing with the binder; by adding the dye to the zinc oxide-binder mixture before it is coated on the paper; or by staining the completed coating with the dye. The patent gives nine examples of how different organic dyes, or a combination of them, can be used for effective dye sensitization. No claim is made that only one dye or one specific combination of dyes has to be used in order for the sensitization process to be effective. Claims 1 through 3 speak in terms of recording elements (electrophotographic layers) using "up to about 0.5% by weight with respect to the weight of said zinc oxide particles of *at least one optically sensitizing dye* which extends the photoconductive spectral sensitivity of said zinc oxide in the visible region of the spectrum, * * * " (Emphasis added.) Claim 4 uses the same language and then specifies a group of dyes which can be used. Claim 5 specifies the use of rose bengal, and claim 7 specifies the use of fluorescein. Claim 8 states: "The recording element of claim 4 wherein a *plurality of dyes* are adsorbed on said zinc oxide particles." (Emphasis added.)

### FINDINGS AND RULINGS

There is no doubt that the 540 Patent represents a step forward from the 539

Patent. The principal issue in the case is whether this was an inventive step or one that would have been obvious at the time to an ordinary skilled chemist in light of the prior art.

Since the patent has issued, there is a presumption that it is valid. 35 U.S.C. § 282 (1964), *as amended,* (Supp. IV, 1968). This presumption of validity, however, does not relieve the Court of its duty of making a detailed and intensive examination of the issues.

■ In the case of Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court outlined the procedure for a District Court to follow when the issue is one of obviousness:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. At 17–18, 86 S.Ct. at 694.

We start, therefore, with a determination of the scope and content of the prior art. It has been stipulated that the subject matter of RCA Patent 539 as set forth in application serial number 383,-677, filed October 1, 1953, constitutes prior art with respect to the patent in suit. Patent 539 will be discussed in detail later.

It has also been stipulated that the Battelle Quarterly Progress Reports 1 to 8, and Final Report (Signal Corps' Prime Contract No. W36–039 sc–36851)

---

2. Adsorption is the adhesion of a dissolved substance to the surface of a solid body with which the substance is in contact as distinguished from absorption in which the solid body assimilates the substance into itself.

were a part of the prior art. The Battelle article, either standing alone or used in conjunction with the other prior art, could not have given Mr. Greig, or any other chemist, much help relative to dye sensitization of an electrophotographic layer containing white zinc oxide crystals. As a matter of fact, reliance on the Battelle Final Report might have led a skilled chemist to exclude the use of organic dyes for increasing spectral response.

Nashua contends that the prior art also includes references relating to dye sensitization in silver halide photography and relies specifically upon six in this field. Four articles by West or West and Carroll (Exs. 22, 23, 24, and 25), excerpts from Neblett's 1930 Book (Ex. 29), and excerpts from Wall's 1925 Book (Ex. 30). In silver halide photography, when light strikes the silver halide emulsion (i. e., the film), a chemical reaction ensues, which produces silver atoms in the areas struck by light. When the film or emulsion is immersed in a developer, these silver atoms are reduced to visible silver. In other words, after the film is exposed to light, there is a latent image of silver atoms which becomes visible when developed. In early silver halide photography, this chemical reaction was only produced by ultra-violet, violet and blue light. However, as early as 1873, H. W. Vogel found that the spectrum of light which causes this chemical reaction could be broadened by the use of organic dye sensitizers adsorbed to the silver halide crystals.[3] The West and Carroll articles, *supra*, explain in great detail the theory of dye sensitization in silver halide photography. Although silver halide photography differs from electrophotography in that it involves a chemical reaction rather than an electrostatic process, it is clear to the Court that the work of West and Carroll in the early thirties would lead a chemist skilled in the art in the early fifties to at least attempt to broaden the spectral response of white zinc oxide crystals by dye sensitization.[4] In connection with this, see also the testimony of Meyer Sugarman, a former co-worker of Mr. Greig, who testified via deposition that he suggested to Mr. Greig the possibility of sensitizing the zinc oxide particles with organic dyes. Mr. Sugarman testified:

> Then extrapolating from this theory [Mott-Gurney theory] and knowing that certain dyes in themselves are photoconductive, *you would expect that certain dyes would sensitize any photoconductor just as they sensitize silver halide* and, of course, the experiments and the publications of West and others pointed out that this was probably a true mechanism, so it would be a logical thing to try without knowing whether it would succeed or not, dye sensitization of zinc oxide. (Emphasis added.) Record, Vol. 4, at 566.

Nashua further contends that the work and consequent articles of two Russians relating to dye sensitized powdered semi-conducting zinc oxide constitute prior art. The Putseiko and Terenin article originally appeared in a Russian publication, but was thoroughly abstracted in the 1949 Chemical Abstracts (Exs. 26 and 27). The Russians investigated and recorded the sensitizing

---

3. Wall, History of Three-Color Photography. Ex. 30, at 212. H. W. Vogel, after his experimentation on dyes and silver halides in 1873, stated:

> From these experiments I believe we ought to conclude with tolerable certainty, that we are in a position to make silver bromide light-sensitive for any desired color, or to increase its existing sensitiveness for certain colors; it is only necessary to add a substance which will accelerate the chemical decomposition of the silver bromide, that

will absorb the color in question and not the others. The existing troublesome photographic inactivity of certain colors ought then to be overcome.

4. See RCA's brief to the Patent Office in support of 539 which stated:

> In view of the disclosure of the Specification and the prior art in electrostatic printing, it is clear that exposure *to a light image* is analogous to exposure in conventional silver halide in photographic processes. (Emphasis in original.) Ex. 32, at 32.

effects of certain organic dyes on a powdered semi-conducting form of zinc oxide without a binder. The Chemical Abstract article made it clear that the Russians had found that white zinc oxide can be sensitized to respond to visible light by the adsorption of organic dyes. As a matter of fact, two of the dyes used by the Russians were also dyes used by Greig in his early attempts to dye sensitize white zinc oxide as part of an electrophotographic layer.[5]

The Court finds that the prior art includes the references to dye sensitization in silver halide photography, and the Chemical Abstract of the Russian article by Putseiko and Terenin.

It is clear to the Court that, once the subject matter of Patent 539 was established, the prior art would have made it obvious to a chemist skilled in the art, that the next logical step would be dye sensitization of the white zinc oxide to increase its spectral response. It is to be pointed out first of all that the 539 Patent explains in detail how the white zinc oxide electrophotographic layer should be made. It contains all the information that a paper manufacturer needs in order to make an electrophotographic layer for coating paper, with the single exception of the inclusion of organic dyes for sensitization of the white zinc oxide particles.

There was certainly nothing novel in the idea of employing dyes to sensitize white zinc oxide crystals. Even Mr. Greig acknowledged in his notebook that the question of dye sensitization had been raised by others than himself. He stated:

> The question, will an organic dye of the type used by the photographic industry sensitize the electrophotographic paper, has been asked by quite a few persons upon viewing the electrostatic printing. Ex. M.

The Patent Examiner pointed out in the File Wrapper of the 540 Patent:

> Thomsen, however, recognizes applicants problem and there is no invention seen [in solving] this in either primary reference by the procedure of any of Putseiko et al or Chemical Abstracts *because the results obtained are but those expected.*[6] (Emphasis added.) Ex. 9A, at 33.

The claims of the 540 Patent are recording elements (electrophotographic layers) which provide an extended photoconductive spectral sensitivity achieved by dye sensitization of white zinc oxide. No claim of a process is made. An analysis of the entire patent, however, discloses that the dye sensitization process is the basic teaching of the patent. The inventive components of the recording elements had already been described comprehensively in Patent 539. The 539 Patent explains in detail the method of incorporating white zinc oxide in a binder to form an electrophotographic layer. The 540 Patent, in effect, repeats that explanation with only one significant difference—the addition of dye sensitizers. Regardless of the claims made, the 540 Patent is just a summary of the dye sensitization experiments that Mr. Greig went through and which produced the expected result.

In its brief on appeal from the decision of the Patent Office rejecting Patent 539, RCA stated that one of the advantages of 539 was that its recording element "may be dye-sensitized to extend the spectral sensitivity thereof to other regions of the spectrum than its normal sensitivity." File Wrapper, Ex. 32B, at 151. And at page 159 of the File Wrapper, RCA once again made the point:

> Briefly, the recording elements of the appealed claims have an improved color, are less expensive, are made from abundant, stable, non-toxic, and

---

5. See Greig's notebook, page 751 (June 2, 1953), Ex. O, and 1949 Chemical Abstracts 7349d, Ex. 26.

6. The reference to Thomsen is to the Thomsen Patent also owned by RCA

which had to do with the preparation of pink zinc oxide to use as part of the "Electrofax" layer and thereby increase its spectral response. Ex. 17.

compatible materials, are light weight and flexible in the coated paper form, *may be dye-sensitized to extend the spectral sensitivity, and may be varied in contrast characteristic.* (Emphasis added.)

RCA's position that one of the advantages of the 539 Patent is its adaptability to dye sensitization contradicts its claim that the 540 Patent, which is based on dye sensitization, is a novel and new invention.

The Court finds that the prior art made dye sensitization of the recording elements taught in the 539 Patent obvious to one with ordinary skill in the art.

The Court will comment briefly upon RCA's contention that, in addition to the prior art, we should, in conformity with the decision in *John Deere Co., supra,* take into consideration the commercial success of the 540 Patent. The commercial success of the 540 Patent is impressive, but its success cannot be separated from the success of the 539 Patent which is the basic invention. There is no doubt that the sales of "Electrofax" paper have mushroomed in a comparatively short time, but RCA does not manufacture either the paper or the copying machine and some credit for the success of the "Electrofax" process must go to the manufacturers of the paper and the machines in which the process is carried out. Another factor in the commercial success of the 540 Patent is the voracious appetite of our affluent society for instant copies of practically everything.

The next issue is the alleged fraud of RCA on the Patent Office. The Court is frank to state that it does not understand why the Patent Office changed its position as to the 540 Patent. It can guess and conjecture, but guess and conjecture have no part in a legal decision. There was no evidence introduced at the trial, either documentary or orally, as to why the Patent Office made an abrupt about-face in regard to the patentability of the· 540 Patent. The Court, obviously, is of the opinion that the Patent Office made a mistake of judgment in issuing the 540 Patent, but it does not follow that such a mistake was due to deliberate misrepresentations by RCA on the Patent Office. Nashua's contention that RCA misrepresented and deceived the Patent Office as to the status of the prior art is not borne out by a careful examination of the File Wrappers of the 539 and 540 Patents. The Patent Examiner had before him all of the prior art references relied on by Nashua.

The affidavit of Mr. Greig relative to the Thomsen Patent did not contain any false statements or misrepresentations. Nashua emphasizes the fact that the Patent Examiner was not told that Thomsen had made his invention before Greig conceived his 540 Patent and that· Greig actually knew about Thomsen's invention before the 540 Patent was invented. The Court does not consider that either a deliberate misrepresentation or a material omission. There is no evidence as to how this affidavit was interpreted and understood by the Patent Examiner and there is no evidence as to what extent, if any, the Patent Examiner relied on it. This, perhaps, may be inferred, but an allegation of fraud requires clear and conclusive proof and should not be based on inferences. Furthermore, it appears to the Court that the Patent Examiner was mistaken in placing the emphasis that he did on the Thomsen Patent. That patent was ·concerned ‑solely with a method of preparation of pink zinc oxide for use in an electrophotographic layer. It is true that the Thomsen Patent recognized that pink zinc oxide would increase the spectral response of the electrophotographic layer, but it made no reference to the use of organic dyes for increasing the spectral response of white zinc oxide. The Court rules that Nashua's claim of misrepresentation has not been proven and, therefore, it is not entitled to recoup any of the royalties already paid RCA under the license agreement.

Nashua also claims that Greig was not the inventor of the 540 Patent. The

Court finds no solid basis for this contention. While the Court has ruled that the 540 Patent was not a patentable invention, Greig was the first one, at least of record, to conduct extensive experiments relative to dye sensitization of white zinc oxide as part of an electrophotographic layer.

The Court makes the following rulings:

(1) That RCA Patent 3,052,540 is invalid;

(2) That RCA Patent 3,052,540 is not infringed; and

(3) That Nashua is not entitled to recoup any of the royalties already paid to RCA under its license agreement.