431 F.2d 220
 NASHUA CORPORATION, Plaintiff, Appellee,
v.
RCA CORPORATION, Defendant, Appellant.
 No. 7540.
 No. 7553.
 United States Court of Appeals, First Circuit.
 August 3, 1970.
 
 William K. Kerr, New York City, with whom David W. Plant, Paul L. Brown, Fish & Neave, New York City, William R. Hulbert, and Fish & Richardson, Boston, Mass., were on brief, for RCA Corp.
 L. William Bertelsen, Boston, Mass., with whom Robert J. Horn, Jr., Herbert P. Kenway, Kenway, Jenney & Hildreth, Boston, Mass., Joseph M. Kerrigan, Chester H. Lopez, and Hamblett, Kerrigan, LaTourette & Lopez, Nashua, N. H., were on brief, for Nashua Corp.
 Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.
 COFFIN, Circuit Judge.
 
 
 1
 The principal question presented by these cross appeals is whether the district court erred in holding invalid as obvious an RCA patent — Greig patent 3,052,540 [hereinafter sometimes patent '540] — which specified 29 organic dyes which increase the sensitivity of the electrophotographic copying paper used in many office copying machines.
 
 
 2
 Harold Greig, a scientist employed by RCA, obtained the patent in 1962 on the basis of discoveries made in 1953. Soon thereafter RCA granted a license to various companies, including Nashua Corporation, to use its patent in the manufacture of electrophotographic copying paper. Nashua paid royalties for some four years, until it served notice on RCA of its belief in the invalidity of the patent and continued using dyes similar to those set forth in patent '540 without paying royalties. Nashua brought suit for a declaration of patent invalidity and a refund of four years' royalties; RCA counter-claimed for infringement. The district court held that the patent was invalid and thus not infringed but that Nashua was not entitled to a refund of royalties. Nashua Corporation v. RCA Corporation, 307 F.Supp. 152 (D.N.H.1969). RCA appeals from the first two determinations, Nashua from the third.
 
 
 3
 The district court's opinion contains a comprehensive description of the pertinent technology and the processes underlying the contested patent. Briefly, one method of copying original documents by electrophotography involves coating the copy paper so that it will receive and retain in darkness an electrostatic charge (the quality of "dark resistivity") and then exposing the electrostatically-charged paper to light, thereby causing the charges to disappear from the exposed portions of the copy paper (the quality of "photoconductivity"). The area which retains the electrostatic charge — a latent image of the document being copied — is then developed by application of a fine powder which is attracted to the remaining charges.
 
 
 4
 In 1951 Greig invented a coating — consisting of certain white zinc oxide powders dispersed in an insulating resin binder — for which RCA obtained a patent [hereinafter patent '539] whose validity is not contested. However, although the coating had the qualities of dark resistivity and photoconductivity, it was not sensitive to ordinary light sources, requiring violet light or light beyond the visible spectrum, i. e., ultraviolet light. This deficiency meant that copying time was fairly slow and that colored marks could not be reproduced.
 
 
 5
 These problems were overcome in 1953 when Greig discovered that by adding certain organic dyes to the coating on the copying paper, the coating became photoconductive to ordinary light sources. Greig's patent '540 set forth 29 organic dyes which alone or in combination sensitized the coating in the afore-described manner.
 
 
 6
 The issue before us is whether Greig's 1953 discovery would have been obvious at that time to a person having ordinary skills in the existing art. 35 U.S.C. § 103 (1964). More precisely, the issue involves a two-part analysis: whether the concept of dye sensitization, as a possible means of making the patent '539 coating photoconductive to ordinary light sources, would have been obvious in 1953,[1] and if so, whether the selection of the 29 organic dyes set forth in patent '540 would have been obvious in 1953, to one trying to dye-sensitize the patent '539 coating. We bear in mind that the determinations underlying the question of obviousness are essentially factual ones primarily entrusted to the district courts. Graham v. John Deere Co., 383 U.S. 1, 5, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Koppers Co. v. Foster Grant Co., 396 F.2d 370, 372 (1st Cir. 1968).
 
 
 7
 Confronting the first of our two questions, we read RCA's brief on appeal virtually to concede that the concept of dye sensitization would have been obvious in 1953 to one seeking to render the patent '539 coating photoconductive to ordinary light.[2] On the evidence presented to the district court, that conclusion seems well-founded. Greig, a chemical engineer with prior experience in synthesizing organic dyes, testified at trial that, in early 1953, "with the background of dye chemistry * * * I was aware that if you want response from visible light, you are going to get into color," with "color" used as a generic reference to various methods and materials, including the use of organic dyes. Moreover, Greig's research notebook contained an entry for May 27, 1953, where, in addition to two pages devoted to other work, Greig had entitled a third page, "Subject: The possibility of increasing the sensitivity of the electrophotographic paper by organic sensitizers," and had begun his 11 line discussion by writing that
 
 
 8
 "the question, will an organic dye of the type used by the photographic industry sensitize the electrophotographic paper, has been asked by quite a few persons upon viewing the electrostatic printing."
 
 
 9
 This suggestion that dye sensitization was in 1953 an obvious avenue to explore in order to overcome patent '539 coating's unresponsiveness to ordinary light is confirmed by other indicia of the existing art in 1953. As early as 1873, H. W. Vogel discovered the sensitizing effect of certain organic dyes on silver bromide and other silver salts, concluding that silver bromide could be made sensitive to ordinary light for any desired color by adding such dyes. Wall, History of Three-Color Photography, 211-212 (1925).[3] Furthermore, four articles by two Americans, West and Carroll, were published in 1947, 1950, and 1951 dealing with dye sensitization of silver halides and dwelling on the relationship of the photographic and photoelectric sensitivity of silver halides.[4] Their work contained reports of experiments with particular organic dyes leading them to the conclusion that "many types of dyes * * * act as optical sensitizers."
 
 
 10
 While the sensitizing effect of organic dyes was thus well established prior to 1953, it remained for two Russian scientists, Putseiko and Terenin, to demonstrate the sensitizing effect of several organic dyes on zinc oxide in its semi-conductive form. One of their formally stated conclusions was "When a number of dyes were adsorbed on the powdered semi-conductors given above, in the photoelectric sensitivity spectrum there appeared additional maxima in the visible region. * * *" An accurate if brief summary of their paper was published in the 1949 Chemical Abstract under its title, "Photosensitization of the internal photoeffect in zinc oxide and other semi-conductors by adsorbed dyes."
 
 
 11
 In its semi-conductive form, however, a zinc oxide had little potential for electrophotography, since its ability to retain an electrostatic charge in darkness (its "dark resistivity") was too low. Greig's patent '539 stipulated as prior art, filled this gap, since its zinc oxide as combined with a resin binder had sufficient dark resisitivity. If, therefore, a skilled chemist might not have thought the Russian experiments to have been useful in electrophotography because that work involved semi-conductors, that reason was removed by Greig's advances in the use of zinc oxide.
 
 
 12
 Moreover, one Sugarman, in 1953, a co-worker of Greig, testified that experimentation with dye sensitization would have been obvious in 1953 even without knowing of the Russian experiments. After briefly explaining the most accepted theory of the silver halide process within an ordinary camera, capsuled in n. 4, Sugarman stated:
 
 
 13
 "Then extrapolating from this theory and knowing that certain dyes in themselves are photoconductive, you would expect that certain dyes would sensitize any photoconductor just as they sensitize silver halide and of course the experiments and the publications of West and others pointed out that this was probably a true mechanism, so it would be a logical thing to try without knowing whether it would succeed or not, dye sensitization of zinc oxide."
 
 
 14
 Finally, Nashua offered two experts, an Associate Professor of Chemistry at the University of Georgia and a Professor of Physics at Ohio State University. Both were familiar with the prior art to which we have alluded. Both testified that on the basis of this art — the publications in the field of silver halide photography, the Russian article, and Greig's patent '539 — the addition of dye sensitizers to increase the spectral response of Electrofax paper would have been obvious to a skilled chemist in 1953. The Ohio State expert, having demonstrated his knowledge of the field, apparently impressed the court and was subjected to only brief cross-examination devoted to eliciting that his own experiments had chiefly involved cadmium sulphide and not zinc oxide.
 
 
 15
 RCA, eschewing "a fruitless confrontation of experts" as imbued with "the medieval philosophy of compurgators and oathhelpers", chose primarily to cast doubt on the neat picture of the prior art capsuled above. However, while important differences do exist between dye sensitization of silver halide and of white zinc oxide,[5] they do not obscure the fact that exposing silver halides to light has the effect of exciting or liberating electrons — a phenomenon parallelled in the similar treatment of zinc oxides and suggestive of further parallels. Similarly, while the Russians' discoveries with semi-conductive zinc oxide did not assure success, they did point to a possible solution of the problem posed by the patent '539 coating. That Sugarman testified only that there should be a parallel between silver halide photography and electrophotography simply confirms our statement above; RCA's contention that Sugarman was simply "rationalizing what he had learned from the work of Greig" need not have been accepted by the district court. The Nashua experts on the basis of all their knowledge and experience and training, testified as to the state of the art in 1953. Their credentials, acquaintance with the field, and objectivity were subjected to the most competent cross-examination. Their credibility was not so impaired that the district court was required to ignore their testimony.
 
 
 16
 We conclude that the evidence presented to the district court supports the court's conclusion that the prior art made dye sensitization of the patent '539 coating obvious in 1953 to one with ordinary skill in the art. That others had tried unsuccessfully before Greig and that his invention was a commercial success do not require a different result. Nor does a brief series of unsuccessful experiments at the Batelle Memorial Institute with dye sensitization of electrophotographic selenium plates persuade us that the court's conclusion was erroneous. Batelle's Final Report did suggest that the experience available in the silver halide field — where organic dye sensitizers had worked — "should be applicable for guiding the work on photoconductors." In short, the Batelle failures with selenium were not so clear a teaching of futility as to signal an end to the long road that had been traveled since 1873.
 
 
 17
 Moving to our second question — whether the selection of 29 specific dyes would have been obvious in 1953 to one trying to dye-sensitize the patent '539 coating — we are confronted with RCA's contention that the district court never faced this question. While the district court did not isolate this as a separate issue, as we have chosen to do at RCA's insistence on appeal (see n. 2), we are satisfied that the court understood the claimed uniqueness of the 29 dyes but dismissed that claim as unfounded.[6] From the evidence presented to the district court, we are inclined to agree. Indeed, while we have dealt separately with the two inquiries set forth above in an effort to clarify the basic issue presented by this appeal, we are satisfied that the two inquiries involve essentially the same "prior art" and should be viewed in pari materia.
 
 
 18
 Greig testified that May 27, 1953, was the first day that he tried to sensitize the patent '539 coating with an organic dye. For two months he had been experimenting with the light sensitivity capacity of a specially prepared colored zinc oxide supplied by another company. Then, on May 27, without any preface other than the entry quoted in text supra posing the general question concerning the application of dye sensitizers to electrophotographic paper, he reported the first experiment which had been conducted that day. Attached to the entry were several prints showing that patent '539 coating to which a small amount of an organic dye named "fluorescin" had been added made a markedly better copy of a one-fifth second exposure than did the coating without such dye. After this initial success, not deemed significant enough for inclusion in the monthly progress report filed by Greig's superior, the record is silent for two and one-half months except for one entry in early June reporting the use of three dyes with no appreciable increase in sensitivity. Then on August 14 the notes report some successful tests using the dye erythrosin. Experiments over the following months with 48 dyes ultimately resulted in identifying 29 dyes which made the '539 coating photoconductive to ordinary light sources.
 
 
 19
 Greig concedes that in fact he was unfamiliar with the literature set forth above as comprising the prior art. His records indicate that he was immediately successful, even though his first choice of "fluorescin" was — by his own admission — "pure guess". He testified that his background in dye chemistry enabled him to select the 48 experimental dyes, since that background made him aware of how some dyes would respond to the problems presented by dye-sensitizing the patent '539 coating.[7] However, there is no contention or evidence that his background was anything other than a competent familiarity with the existing art. Moreover, both Nashua experts testified that the selection of the 29 dyes set forth in patent '540 would have been within the skill of the art in 1953.[8] Thus, it seems clear that the selection of the 48 experimental dyes involved little more than the application of the existing knowledge of dye characteristics.
 
 
 20
 We of course recognize that "[p]atent-ability shall not be negatived by the manner in which the invention was made." 35 U.S.C. § 103 (1964); see Graham v. John Deere Co., supra, 383 U.S. at 15-16, 86 S.Ct. at 684 and nn. 7-8. In our case, whether the 48 experimental dyes were selected by "a flash of genius", or "pure guess", or "long toil and experimentation", the facts remain that the use of dye sensitizers was an obvious possibility for solving the single short-coming of the patent '539 coating, a competent familiarity with the characteristics of organic dyes would have led one skilled in the art to a limited number of possible dyes, and the process of adding organic dyes to the patent '539 coating was — by RCA's own concession — obvious. Given these three facts, we agree with the district court's implicit finding that the selection of the 29 organic dyes set forth in patent '540 would have been obvious to one skilled in his art in 1953. While no two cases are precisely comparable, this case is of the genre, and falls within the principle, of Koppers, 396 F.2d at 372, where we said, "* * * to grant a patent to the first person who finds the exact combination when experimenting within a known field could give too much force to the patent laws."
 
 
 21
 Patent '540 being invalid for obviousness, Nashua contends that it is entitled to a refund of all royalties paid thereunder. However, its claim admittedly depends on a finding that RCA misrepresented material facts to the Patent Office in order to obtain patent '540. Such finding, we, like the district court, cannot make on this record.
 
 
 22
 Greig made two attempts to have his dye sensitizers patented prior to 1962; both applications were rejected, in part because of Thomsen patent 2,727,808. RCA then filed Greig's affidavit under Rule 131 of the Patent Office Rules of Practice to the effect that the '540 invention was conceived and tested prior to October 21, 1953, the filing date of the Thomsen patent. Soon thereafter, the Patent Office granted patent '540 to Greig's dye sensitization of the patent '539 coating.
 
 
 23
 Nashua concedes that the '540 invention was conceived prior to the filing of the Thomsen patent, so that Greig's affidavit was a true statement and in full compliance with Rule 131. However, Nashua contends that the Thomsen application — which began with a brief description of Greig's '539 invention — was the only evidence before the Patent Office that the '539 invention was known to someone outside the Patent Office and was therefore prior art for the '540 invention. Thus, contends Nashua, when RCA overcame the Thomsen application with its Rule 131 affidavit,[9] it purposely eliminated the only evidence that the '539 invention was prior art for '540 even though RCA has consistently conceded during trial that the '539 invention was prior art for patent '540.[10]
 
 
 24
 RCA's reply that the patent '540 application described the '539 invention is completely true but we think it misses the point; such description did not establish that the '539 invention was prior art for the '540 application.[11] Thus, the practical — if not intended — effect of the affidavit may have been to remove the only indication that the '539 invention was in fact prior art.
 
 
 25
 Our problem — and Nashua's — lies in the fact that the only evidence on this issue is the cryptic and technical file wrapper exchanges between the Examiner and the applicant. These exchanges are ambiguous as to precisely why the Examiner rejected the first two applications and what significance the Examiner attached to RCA's amendment of its copending '539 application and to RCA's Rule 131 affidavit. Given these critical ambiguities, we cannot say that the district court was clearly erroneous in finding no fraud on RCA's part. It is simply not sufficiently clear to us that RCA filed the affidavit realizing that its effect would be to materially misrepresent the prior art and deliberately intending such misrepresentation. Compare University of Illinois Foundation v. Blonder-Tongue Laboratories Inc., 422 F.2d 769, 776-777 (7th Cir. 1970).
 
 
 26
 We therefore uphold the district court's finding that the filing of the Rule 131 affidavit did not constitute a fraud on the Patent office. Given that finding, Nashua properly concedes that its claim for a refund of royalties is without merit.
 
 
 27
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 RCA has stipulated that patent '539 is a part of the prior art for purposes of determining whether patent '540 would have been obvious in 1953
 
 
 [2]
 At page 11 of its brief on appeal, after taking issue with the district court for allegedly misunderstanding the invention set forth in patent '540, RCA states:
 "The question to be resolved on this appeal is not the broad question of whether the concept of dye sensitization of Greig's earlier '539 Electrofax layer would have been obvious. The question to be resolved is whether or not Greig's discovery of particular dyes which yielded new and specific Electrofax layers of superior quality and performance would have been obvious." [Emphasis added.]
 Two pages later, RCA insists that
 "* * * the broad concept of dye sensitization was nothing more than Greig's point of departure on the way to his '540 invention." [Emphasis added.]
 On pages 26-27, the brief states:
 "The '540 invention was the discovery that a carefully and precisely selected number of organic dyes, when added in proper amounts to the Electrofax layer, would produce the needed supplemental spectral response * * *."
 
 
 [3]
 Wall also listed more than 300 dyes which had the capacity to act as sensitizers of silver bromide. RCA dismisses this work, nearly three decades before Greig's discovery, by pointing out discrepancies between Greig's 29 dyes and Wall's list. For example, in Wall's list of some 300 sensitizers, Greig found five that would not sensitize his patent '539 coating, and Wall's list of non-sensitizers included two which Greig found would sensitize his coating. We note, however, that almost a third of the 48 dyes with which Greig experimented appeared on Wall's list of sensitizers and that Greig's list of 29 sensitizers included 8 listed by Wall as sensitizers
 
 
 [4]
 The use of silver halides in conventional photography is the context of much of the literature in the prior art. A succinct description of the image-making process is given by the district court:
 "In silver halide photography, when light strikes the silver halide emulsion (i. e., the film), a chemical reaction ensues, which produces silver atoms in the areas struck by light. When the film or emulsion is immersed in a developer, these silver atoms are reduced to visible silver. In other words, after the film is exposed to light, there is a latent image of silver atoms which becomes visible when developed. In early silver halide photography, this chemical reaction was only produced by ultra-violet, violet and blue light. However, * * * H. W. Vogel found that the spectrum of light which causes this chemical reaction could be broadened by the use of organic dye sensitizers * * *." 307 F.Supp. at 156.
 
 
 [5]
 The former depends on a chemical reaction, the latter on an electrical phenomenon; the photoexcited electrons in the former stay within the silver halide crystal lattice, while those in the latter move through the entire layer; the latent image in the former is formed by a permanent, irreversible change and the layer is destroyed in development, while in the latter no irreversible change takes place during image formation and the layer is not destroyed; the former process does not require the retention of an electrostatic charge on the silver halide emulsion, the latter depends on such retention by the coated paper
 
 
 [6]
 The court stated, 307 F.Supp. at 157, that
 "Regardless of the claims made, the 540 Patent is just a summary of the dye sensitization experiments that Mr. Greig went through and which produced the expected result."
 RCA's trial brief repeatedly made claims concerning the uniqueness of the 29 dyes, and we cannot assume that the court overlooked such claims. What is more likely from the evidence presented and from the court's opinion as a whole is that the court believed that the only possible invention here was the concept of dye-sensitizing the patent '539 coating, but that having found that concept obvious by 1953 art, the selection of the particular dyes was simply a matter of trial-and-error experimentation with a limited number of known dyes. As our text indicates, we agree. However, we do disapprove of such oblique treatment of important claims; the court should have spelled out its findings and rationale as to this issue with more care.
 
 
 [7]
 The problems anticipated by Greig related to solubility, resistance to heat and to oxidization, and shelf life
 
 
 [8]
 When asked how one would determine which dyes would work, the expert from Ohio State replied, "By trial and error". Elaborating, he testified that one could narrow the field of available dyes by considering the experience in silver halide photography and the experiments of Putseiko and Terenin
 
 
 [9]
 37 C.F.R. § 1.131 provides, in relevant part:
 
 "Affidavit of prior invention to overcome cited patent or publication.
 
 (a) When any claim of an application is rejected on reference to a domestic patent which substantially shows or describes but does not claim the rejected invention, * * * and the applicant shall make oath to facts showing a completion of the invention in this country before the filing date of the application on which the domestic patent issued, * * * then the patent or publication cited shall not bar the grant of a patent to the applicant, * * *."
 
 
 [10]
 Nashua's appellate brief confuses the issue by intermittently claiming that Greig's affidavit also concealed the fact that Greig in fact knew of Thomsen's invention before he invented '540. Were the Thomseninvention (as opposed to information disclosed in his application) relevant prior art for Greig's '540 invention, Nashua's argument might have some merit. However, neither Nashua nor the district court — nor, for that matter, have we — relied on the Thomsen invention to show that Greig's '540 invention was obvious. Thus, there was no material misrepresentation in this regard.
 
 
 [11]
 Since one's copending application isnot prior art for his later copending application — see, e. g., Application of Land, 54 C.C.Pa. 806, 368 F.2d 866, 874-877 (1966); compare Hazeltine Research, Inc. v. Brenner, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304 (1965) — the later application's description of the invention set forth in the earlier application does not establish the former invention as prior art, particularly since patent applications are completely confidential until a patent issues. 35 U.S.C. § 122 (1964).