**MONSANTO COMPANY, Appellant,**

v.

**ROHM & HAAS COMPANY.**

No. 19132.

United States Court of Appeals, Third Circuit.

Argued May 3, 1971.

Decided Jan. 12, 1972.

As Amended March 9, 1972.

Kalodner, Circuit Judge, dissented and filed opinion.

C. Frederick Leydig, Wolfe, Hubbard, Leydig, Voit & Osann, Chicago, Ill. (Pepper, Hamilton & Sheetz, Philadelphia, Pa., John E. Rosenquist, Chicago, Ill., Arnold H. Cole, St. Louis, Mo., on the brief), for appellant.

Arthur G. Connolly, Sr., Connolly, Bove & Lodge, Wilmington, Del. (Werner H. Hutz, Rudolf E. Hutz, Wilmington, Del., on the brief), for defendant-appellee.

Before KALODNER, VAN DUSEN and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

Monsanto Company appeals from a judgment declaring invalid and unenforceable its U. S. Patent No. 3,382,280, known as the Huffman patent, issued May 7, 1968.[1] The action arose in an infringement proceeding Monsanto brought against Rohm and Haas Company, in which the defendant counterclaimed for a declaratory judgment of invalidity and for an injunction and damages for unfair competitive acts against defendant's allegedly infringing product.[2]

Preliminarily, we observe that Rohm and Haas, as a defendant in the proceedings below, had the right to challenge the validity of the patent on the ground that it was obtained by fraudulent misrepresentation.[3] In Walker Proc-

---

1. Extracts from the patent:

> 3′,4′ - DICHLOROPROPIONANILIDE, Clarence W. Huffman, Glenview, Ill., assignor to Monsanto Company, St. Louis, Mo., a corporation of Delaware, Abstract of the Disclosure: 3′,4′-dichloropropionanilide is a new compound which has outstanding herbicidal properties.
>
> . . . (Col. 1)
>
> The herbicidal efficiency of 3,4-DCPA is surprising, for related compounds possess little or no herbicidal efficiency. When tested as described above, aqueous emulsions of a random group of such related compounds are found to possess little or no herbicidal activity. Some of the compounds are set forth below:
> 3′-chloroisobutyranilide
> 3′-chloroacetanilide
> 4′-bromo-2′-phenylacetanilide
> 2′,4′-dichloropropionanilide
> 2′,4′-dichloroisobutyranilide
> 2′,4′,5′-trichloroisobutyranilide
> 3′,4′-dichlorolauranilide
> 2′4′-dimethylpropionanilide
> N-methylacetanilide
> N-n-butylacetanilide
> p-chloracetylacetanilide
> 2′,4′-dimethylpropionanilide
> 2-chloro-2′,4′-dimethylpropionanilide

2. District court jurisdiction is based on 35 U.S.C. § 271, 28 U.S.C. §§ 1338 and 1400. Proceedings in other aspects of defendant's counterclaim were deferred until appellate review of the declaratory judgment duly certified by the district court under Fed.R.Civ.Pro. 54(b).

3. The right to such an action has had an oblique history. Though the patent acts of 1790 (Act of 1790, § 5, 1 Stat. 109) and 1793 (Act of 1793, § 10, 1 Stat. 318) expressly granted a private party the right, upon allegations of fraud, to petition the district court for an order requiring the patentee to show cause why his letters patent should not be repealed, the omission of the provision in the 1836 Act (Act of 1836, 5 Stat. 117) prompted the Supreme Court to conclude in 1871 that "no one but the government, either in its own name or the name of its appropriate officer can institute judicial proceedings for the purpose of vacating or rescinding the patent which the government has issued to an individual . . . [except in those cases asserting the statutory defenses to private infringement actions permitted by the 1839 Act]." Mowry v. Whitney, 81 U.S. 434, 14 Wall. 434, 20 L.Ed. 858 (1871). The right of the government to bring an action to

ess v. Food Machinery, 382 U.S. 172, 176, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965), the Court said:

> Under the decisions of this Court a person sued for infringement may challenge the validity of the patent on various grounds, including fraudulent procurement. E. g., Precision Instrument Mfg. v. Automotive Maintenance Machinery Co., 324 U.S. 806 [65 S.Ct. 993, 89 L.Ed. 1381] (1945); Hazel-Atlas Co. v. Hartford-Empire Co., 322 U.S. 238 [64 S.Ct. 997, 88 L.Ed. 1256] (1944); Keystone Driller Co. v. General Excavator Co., 290 U.S. 240 [54 S.Ct. 146, 78 L.Ed. 293] (1933). In fact, one need not await the filing of a threatened suit by the patentee; the validity of the patent may be tested under the Declaratory Judgment Act, 28 U.S.C. § 2201 (1964 ed.). See Kerotest Mfg. Co. v. C–O Two Fire

Equipment Co., 342 U.S. 180, 185 [72 S.Ct. 219, 222, 96 L.Ed. 200] (1952).

The patent in suit is for a chemical compound known as 3,4-dichloropropionanilide, hereinafter 3,4-DCPA or propanil. The 1967 patent application asserted that only 3,4-DCPA had unusual and valuable herbicidal activity and that this activity was "surprising" because "related compounds possess little or no herbicidal efficiency." The district court concluded that Monsanto intentionally withheld material facts in order to mislead the Patent Office, thereby making its application for a patent taken as a whole misleading; that Monsanto came into court with unclean hands; that it was guilty of laches in asserting any right to patent the compound; that 3,4-DCPA was obvious within the meaning of 35 U.S.C. § 102; and that the compound was "described in printed publications" within the meaning of 35 U.S.C. 102(a), (b) and was therefore anticipated.[4] Monsanto Co. v.

annul a patent was firmly established in United States v. Bell Tel. Co., 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450 (1888), and the right was deemed exclusive United States v. American Bell Tel. Co., 159 U.S. 548, 555, 16 S.Ct. 69, 40 L.Ed. 255 (1895); Briggs v. United Shoe Machinery, 239 U.S. 48, 50, 36 S.Ct. 6, 60 L.Ed. 138 (1915); Carson Inv. Co. v. Anaconda Copper Mining Co., 26 F.2d 651, 660 (9th Cir. 1928).

Since 1915, however, our research discloses no Supreme Court case holding that the right to seek patent nullification has been expressly limited to the United States. Of course, a patentee guilty of obtaining a patent by fraudulent conduct could be denied equitable relief when bringing an infringement action, thus rendering the patent unenforceable against a defendant who could prove unclean hands. *Precision Instrument, supra*; Hazel Atlas Co. v. Hartford-Empire Co., *supra*. (Implicit in Justice Roberts' dissent is the recognition that only the United States can seek actual nullification, 322 U.S. at 252, 64 S.Ct. 997, 88 L.Ed. 1250; *Keystone Driller, supra.* Cf. Hazelton Research v. Avco Mfg. Corp., 227 F.2d 137, 146 (7th Cir. 1955); Vortex Mfg. Co. v. Ply-Rite Contracting Co., 33 F.2d 302, 310 (D.Md.1929); Alliance Securities Co. v. J. A. Mohr & Son, 14 F.2d 793, 798 (N.D.Cal.1926).

Thus, it may still be true that only the government may seek actual nullification or cancellation of a patent, though the boundaries of its rights in this area are not yet firmly drawn. See United States v. Glaxo Group Limited, 302 F.Supp. 1, 11–15 (D.D.C.1969). But that a private litigant may seek a declaration of invalidity, as pursued here by Rohm and Haas, is no longer open to question.

4. A similar, subsequent action by Monsanto, based on the same patent, was sustained by a district court in Texas, Monsanto v. Dawson Chemical Corp., 312 F.Supp. 452 (S.D.Tex.1970). We do not find persuasive that court's treatment of the misrepresentation issue or its conclusion that Monsanto "did nothing more than put their best foot forward," 312 F.Supp. at 463. Moreover, though the Texas district court considered and rejected the possible *res judicata* effects of Judge Masterson's prior decision, 312 F.Supp. 464–465, the Fifth Circuit Court of Appeals has reversed and remanded that decision in light of the Supreme Court's recent ruling in Blonder-Tongue Laboratories, Inc. v. Univ. of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed. 2d 788, (1971). Monsanto v. Dawson Chemical Corp., 443 F.2d 1035, 1037 (5th Cir. 1971):

> On May 3, 1971, the Supreme Court [in *Blonder-Tongue, supra*] with unani-

Rohm and Haas Co., 312 F.Supp. 778, 798–799 (E.D.Pa.1970).

In the view we take, it becomes necessary to reach only the misrepresentation issue. And to do this requires a discussion of the chemical compounds in question, those related to them, and the various properties associated with them. Closely related to 3,4-DCPA is the chemical compound 3,4-dichloroacetanilide (3,4-DCAA), differing in its structural formula solely by having one less $CH_2$ group.

The first Monsanto (Huffman) application pertinent to these proceedings was filed May 27, 1957, and covered a class of 3,4-dichloroanilides comprising some one hundred compounds, including 3,4-DCPA and 3,4-DCAA, claiming herbicidal [5] compositions of chemical compounds and the use of these compounds to destroy undesired plants.[6] Huffman claimed that the members of the class possessed "unusual and valuable herbicidal activity," while related compounds possessed "little or no herbicidal efficiency." Huffman confirmed this "unusual and valuable herbicidal activity" of *all* the compounds *included* in the claim. The Patent Office, in four separate office actions, rejected all of Huffman's claims as unpatentable under prior art disclosures.

Monsanto, through Huffman, tried again on May 8, 1961. Its application disclosed another large class of 3,4-dihalogenated anilides, again including 3,4-DCPA and 3,4-DCAA. Urging anew that the class possessed "unusual and valuable herbicidal activity," the application averred that, in addition to 3, 4-DCPA, both 3'4'-dichloroisobutyranilide and 3'4'-dichloromethacrylylanilide were useful as selective post-emergent herbicides for rice.[7] And again the Patent Office rejected the claim of the application as unduly broad and unpatentable over the prior art.

The patent in suit was the third Monsanto application filed on February 3, 1967. This time it was represented that only 3,4-DCPA had "unusual and valuable herbicidal activity" and that the activity of this compound was "surprising" because "related compounds possess little or no herbicidal efficiency." The examiner rejected the single compound claim as obvious under prior art disclosing homologs [8] and isomers [9] of 3,4-DCPA, including 3,4-DCAA and 2,4-dichloropropionanilide. The patent was issued, however, on May 7, 1968, after Monsanto submitted an affidavit of Dr. Robert F. Husted, based on tests performed by him on twenty plant species at three different rates of application per acre. The report as presented to the Patent Office asserted that 3,4-DCPA completely killed or severely injured nine of the eleven species and failed to have any effect on only two. Eight other

mous wisdom reversed its earlier holding in [Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936)] The Court ruled that a patent owner is bound by the judgment of patent invalidity in a prior suit against a different defendant unless the patent owner can show that for some reason the prior judgment should not be given this estoppel effect.

5. Capable of destroying plants.

6. Uncontested on the record are indications of substantial contemporaneous activity by Rohm and Haas. Appellee had developed 3,4-DCPA in 1957 and filed patent applications disclosing three compounds, including 3,4-DCPA, in 1958. In 1959, Rohm and Haas was issued a South African patent describing and claiming 3,4-DCPA as a selective, post-emergence herbicide. The compound's properties were reported by Dr. Roy Smith of the U. S. Department of Agriculture at the Southern Weed Conference in January, 1960; Dr. Smith's report was circulated generally thereafter.

7. A selective, post-emergent herbicide when applied after emergence to a crop and weeds normally associated therewith, substantially destroys the weeds without adversely affecting the crop.

8. A homolog is a member of a series of compounds in which each member differs from the next member by a constant number of atoms.

9. Isomers are chemical compounds having the same molecular formula but different molecular structures.

compounds were reported to have no effect on any of the eleven plants and two other compounds, one of them 3,4-DCAA, either had very slight or no effect. Significantly, although the Husted tests entailed tests on twenty species, at three separate rates of application per acre, the Patent Office was informed of tests on only eleven species and only at one rate of application, two pounds per acre. In all, the affidavit showed less than 25 per cent of Husted's results; of 899 tests, only 110 were submitted.

The district court concluded that this close-cropping of Husted's findings amounted to misrepresentation.[10] Moreover, Judge Masterson found misrepresentation in the inconsistency of Monsanto's 1967 representations of 3,4-DCPA's unique herbicidal efficiency, despite assertions in 1957 and 1961 that 3,4-DCAA and other 3,4-dichloroanalides also had activity as herbicides.

■ The concept of misrepresentation as applied to patent infringement cases admits to no fixed parameters and promulgates no specific dogma. At best it is an abbreviated expression of basic equitable maxims inherent in the law of patents; a recognition that a part of the

10. The district court's Finding 37 set forth:

In its attempt to persuade the Patent Office that 3,4-DCPA was patentable over such prior art compounds, Monsanto, in the course of prosecuting this third application, filed on or about November 9, 1967, the affidavit of Dr. Robert F. Husted. (DX-1, pp. 47–50). This affidavit was drafted by one of Monsanto's patent attorneys and was based upon tests performed by Dr. Husted on about 20 plant species at three different rates of application per acre. The results of these tests were reported by Husted to counsel by letter with attached charts (DX-22). The affidavit only reports the results of tests of 10 compounds applied to 11 plant species at the rate of 2 lbs. per acre of application. The results were that 3,4-DCPA completely killed or severely injured 9 of the 11 species and failed to have any effect on only 2. By contrast, 8 other compounds were reported to have no effect on any of the 11 plants and two other compounds, one of them 3,4-DCAA, either had very slight effect or no effect.

A comparison of the affidavit (DX-1, pp. 47–50) with the letter and charts forwarded to counsel by Husted (DX-22) reveals the following (Cole, N.T. 787–813):

1. The affidavit states that 3,4-DCPA completely kills radishes at 2 lbs. per acre, earning a "4" rating (DX-1, p. 49). The charts attached to Husted's letter to counsel reveal that 3,4-DCPA only has moderate herbicidal value at 2 lbs. per acre, earning a "2" rating (DX-22, last page).

2. The charts in DX-22 indicate that at 2 lbs. per acre 3,4-DCAA has complete kill value on pigweed, earning a rating of "4" (DX-22, next to last

page). The affidavit completely omits the results of this test. (DX-1, p. 49).

3. The affidavit fails to contain the results of tests where a compound other than 3,4-DCPA attained a rating higher than "1" (DX-1, p. 49). The second to last chart in DX-22 reveals that at 2 lbs. per acre, three compounds other than 3,4-DCPA achieved a rating of "2," which means a moderate herbicidal value.

4. The affidavit reports that 3,4-DCPA at 2 lbs. per acre achieved a "3" or "4" rating on all plant species except two where it achieved a "0" rating (DX-1, p. 49). DX-22 reveals that at 2 lbs. per acre 3,4-DCPA had a rating of less than 3 on several plant species, which results were not reported in the affidavit.

5. The affidavit fails to contain the results of Husted's testing at other than 2 lbs. per acre. (DX-22, first four charts). These show that 3,4-DCPA is somewhat less active at rates other than 2 lbs. per acre.

In addition to the above, the Huffman and Allen article (DX-8) reports the results of tests on various crops at 8 lbs. per acre of application and shows that 3,4-DCAA exhibits high herbicidal activity. This article, as well as the results of the tests in DX-22, were not brought to the attention of the patent examiner (Cole, N.T. 811).

These omissions were intentionally and deliberately made to mislead the patent office into believing that 3,4-DCPA had outstanding herbicidal value as compared to related compounds. The Husted affidavit failed to state facts necessary to be stated in order to make Monsanto's representation to the patent office, taken as a whole, not misleading. 312 F.Supp. at 785–786.

*quid pro quo* for the acquisition of a patent monopoly is an insistence that the circumstances surrounding the application for the patent be "free from fraud and other inequitable conduct." Precision Co. v. Automotive Co., *supra*, 324 U.S. 806, 816, 65 S.Ct. 993, 998, 89 L.Ed. 1381 (1945).

We perceive the test to be that set forth by the Supreme Court in *Precision*: "The facts of a given case must accordingly be measured by both public and private standards of equity":

The guiding doctrine in this case is the equitable maxim that "he who comes into equity must come with clean hands." This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be "the abettor of iniquity." Bein v. Heath, 6 How. 228, 247 [47 U.S. 228, 12 L.Ed. 416]. Thus while "equity does not demand that its suitors shall have led blameless lives," Loughran v. Loughran, 292 U.S. 216, 229 [54 S.Ct. 684, 689, 78 L.Ed. 1219], as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue. Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245 [54 S.Ct. 146, 147, 78 L.Ed. 293]; Johnson v. Yellow Cab Co., 321 U.S. 383, 387 [64 S.Ct. 622, 624, 88 L.Ed. 814]; 2 Pomeroy, Equity Jurisprudence (5th Ed.) §§ 397–399.

This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is "not bound by formula or restrained by any limitation that tends to trammel the free and just ex-ercise of discretion." Keystone Driller Co. v. General Excavator Co., *supra*, 245, 246 [54 S.Ct. 147, 148, 78 L.Ed. 293]. Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor.

Moreover, where a suit in equity concerns the public interest as well as the private interests of the litigants this doctrine assumes even wider and more significant proportions. For if an equity court properly uses the maxim to withhold its assistance in such a case it not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public. The determination of when the maxim should be applied to bar this type of suit thus becomes of vital significance. See Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 492–494 [788, 62 S.Ct. 402, 405, 406, 315 U.S. 788, 314 U.S. 488, 86 L.Ed. 363].

. . . The possession and assertion of patent rights are "issues of great moment to the public." Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246 [64 S.Ct. 997, 1001, 88 L.Ed. 1250]. See also Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 665 [64 S.Ct. 268, 271, 88 L.Ed. 376]; Morton Salt Co. v. Suppiger Co., *supra*; United States v. Masonite Corp., 316 U.S. 265, 278 [62 S.Ct. 1070, 1077, 86 L.Ed. 1461]. A patent by its very nature is affected with a public interest. As recognized by the Constitution, it is a special privilege designed to serve the public purpose of promoting the "Progress of Science and useful Arts." At the same time, a patent is an exception to the general rule against monopolies and to the right to access to a free and open market.

The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope. The facts of this case must accordingly be measured by both public and private standards of equity.

Precision Co. v. Automotive Co., 324 U. S. 806, 814–816, 65 S.Ct. 993, 997, 89 L. Ed. 1381 (1945).

 Otherwise stated, the test is whether the applicant for a patent has "displayed that standard of conduct requisite to the maintenance of this suit in equity." *Ibid,* 324 U.S. 819, 65 S.Ct. 999, 89 L.Ed. 1381.[11] Basically the issue resolves itself to a determination whether the representation to the Patent Office that "related compounds possess little or no herbicidal efficiency" was "tainted with inequitableness." [12]

In view of Huffman's previously unsuccessful attempts to obtain a patent, it is reasonable to conclude that his success with his 1968 application, originally rejected by the examiner, and later accepted after presentation of the Husted Report, was attributed to his emphasis that the compound possessed properties of "surprising . . . herbicidal efficiency" not possessed by related compounds. "From the standpoint of patent law, a compound and all its properties are inseparable; they are one and the same thing." Application of Papesch, 315 F.2d 381 (C.C.P.A.1963).

 Thus, in view of the previous patent application rejections on the ground of prior art, it cannot be said that it was the unique chemical formula of 3,4–DCPA which gave rise to the issuance of the patent, but the representation made of it as a "compound and all its properties." Indeed, it was emphasized that these properties effected a herbicidal efficiency not possessed by related compounds. This being the thrust of the representation to the Patent Office, it required the applicant seeking a patent monopoly to exercise a degree of candor and disclosure as to the herbicidal efficiency of related compounds commensurate with "equitable standards of conduct." *Precision Co., supra.*

 The Husted affidavit to the Patent Office did not nearly reflect the total Husted test as transmitted to Huffman. Indeed, an examination of the report permits, if not compels, the misleading inference that it constituted a complete and accurate analysis of all the testing instead of an edited version thereof. Concealment and nondisclosure may be "evidence of and equivalent to a false representation, because the concealment or suppression is, in effect, a representation that what is disclosed is the whole truth." Stewart v. Wyoming Cattle Ranch Co., 128 U.S. 383, 388–89, 9 S.Ct. 101, 103, 32 L.Ed. 439 (1888). See, Concealment and Nondisclosure, Chafee and Re, Equity, 5th Ed., 1967, at 635–644.

---

11. Story's Equity Jurisprudence (14th Ed.) vol. 1, § 99 :

Equity imperatively demands of suitors in courts fair dealing and righteous conduct with reference to the matters concerning which they seek relief. He who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice, or unfairness will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly "within the law." Misconduct which will bar relief in a court of equity need not necessarily be of such a nature as to be punishable as a crime or to constitute the basis of a legal action. Under this maxim, any willful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fairminded men, will be sufficient to make the hands of the applicant unclean. Both courts and textwriters have repeatedly spoken upon this subject in no uncertain language.

12. The Supreme Court has recently emphasized the applicability of equitable principles under federal declaratory judgment proceedings. See Samuels v. Mackel, 401 U.S. 66, 70, 91 S.Ct. 764, 27 L.Ed. 2d 688 (1971).

Moreover, it cannot be convincingly argued that the examiner in the Patent Office in 1967, in a proceeding numbered 613,738, can be charged with knowledge of all the contents of an abandoned application numbered 661,575 made in 1957. The record indicates that Huffman made no effort to bring to the attention of the Patent Office in 1967—when he was seeking a patent on 3,4–DCPA *per se*, attributing to it special herbicidal efficiencies not possessed by related compounds—that in 1957, and again in 1961, he had made representations to the Patent Office inconsistent with those made in 1967.

What, then, is the effect of this failure to make total disclosure? Clearly, if the 1968 patent on 3,4–DCPA qualified on its own as a formula or compound *per se*, without any consideration of its property for "unusual and valuable herbicidal activity" not possessed by related compounds, the necessity for a full and complete disclosure of the effect of its properties would not assume the importance it requires here. In Application of Papesch, *supra*, 315 F.2d 381 at 391, while considering the importance of properties of new chemical compounds in the context of determining unobviousness, Judge Rich emphasized:

"From the foregoing cases it will be seen that this and other courts, . . . have determined the unobviousness and patentability of new chemical compounds by taking into consideration their biological or pharmacological properties. Nine of the ten cases above considered, directly or indirectly, involved such properties. Patentability has not been determined on the basis of obviousness of structure alone. In fact, where patentability was found in the above cases it was found in spite of the close similarity of chemical structure, often much closer similarity than we have here.

" . . . From the standpoint of patent law, a compound and all its properties are inseparable; they are one and the same thing."

See also Commissioner of Patents v. Deutsche, 130 U.S.App.D.C. 95, 397 F.2d 656 (D.C.Cir. 1969) where Chief Justice, then Judge, Burger, emphasized this same principle.

Applying these considerations to *Precision's* test of "both public and private standards of equity" we cannot bring ourselves to say that the application for the 1968 patent "displayed that standard of conduct" demanded under the circumstances. We hold that under the "totality of circumstances"—(1) the rejection for obviousness in 1957 of the class of compounds of which 3,4–DCPA was a member and the representations of their common properties with related compounds; (2) the similar rejection in 1961 for the same reasons, and (3) the original rejection of the application in 1967 and the subsequent acceptance only after receipt of the Husted affidavit—Monsanto was obliged to disclose more information as to the herbicidal properties of related compounds to the Patent Office than it did; for "what is at issue is not merely a contest between the parties but a public interest that cancelled or rejected claims not be revived and restored." General Instrument Corp. v. Hughes Aircraft Co., 399 F.2d 373, 385 (1st Cir. 1968.)[13] Under these circumstances, it was impossible for the Patent Office fairly to assess Monsanto's application against the prevailing statutory criteria. Thus, Monsanto's failure to disclose amounted to misrepresentation transgressing equitable standards of conduct owed the public by the applicant in return for its monopoly.

13. As the Supreme Court stated in Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 702, 15 L.Ed.2d 545 (1966) :
"Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent."

Accordingly, Monsanto was not entitled to the patent monopoly, and the district court did not err in issuing the declaratory judgment of invalidity.[14]

The judgment of the district court will be affirmed.

KALODNER, Circuit Judge, (dissenting).

I disagree with the majority's determination that the District Court did not err when it held Monsanto's Huffman patent unenforceable on the ground that it was fraudulently obtained.

I would reverse the District Court's stated holding for these later developed reasons:

1. The District Court committed prejudicial error when it applied an erroneous standard of proof, *viz.*, that fraudulent procurement of a patent may be established by a "preponderance of the evidence." The applicable standard of proof is "clear, unequivocal and convincing evidence."

2. The District Court committed prejudicial error when it held that *"a specific intent to deceive is not necessary* to bar a patent when there is evidence of a deliberate withholding of material information," and, "even if the decision

not to disclose was motivated *by nothing more than bad judgment* as to the materiality of the information, the patent must still be rejected." [1] (emphasis supplied).

3. It is settled that a party charging fraudulent procurement of a patent must prove by "clear, unequivocal and convincing evidence" that the Patent Office would not have issued the patent except for the fraud, and here there was not a scintilla of evidence that the Patent Office was misled into issuing the patent by the conduct condemned by the District Court. Indeed, the District Court did not make *any finding of fact* that the Patent Office was misled.

4. The District Court's fact-findings that the undisclosed "material" was of critical dimension in the obtaining of the patent and that there was a "deliberate withholding" of the material, were "clearly erroneous" since they were not established by "clear, unequivocal and convincing evidence" but by application of an inapplicable "preponderance of the evidence" standard of proof.

*First:* as to the District Court's erroneous application of a "preponderance of evidence" standard of proof in adjudicating Monsanto's patent unenforceable

---

14. The dissent expresses the view that the district court misapprehended the appropriate burden of proof required for a judgment of invalidity. From a colloquy occurring upon argument of appellant's motion for a new trial, the dissent finds that the district court believed that preponderance of the evidence, rather than clear and convincing proof, was enough to carry Rohm & Haas' allegation. Such an inference is refuted by the court's formal conclusions of law themselves. The court expressly stated that "[u]pon our examination of the record, we have concluded that Rohm and Haas has met its burden of proving invalidity by clear and convincing proof." Monsanto v. Rohm & Haas, *supra*, 312 F.Supp. at 797. The court then formally concluded: "6. Even if the presumption of validity were not destroyed, Rohm and Haas has met its burden of proving invalidity by clear and convincing proof." *Id.*, at 798. After argument on the motion, during which

the colloquy relied upon by the dissent occurred, the court reaffirmed: "As to whether Rohm and Haas has met its burden of proof, we have decided to let the record stand as it is." *Id.*, at 799.

The dissent makes much of the district court's supplemental opinion, accentuating its reference to intentional fraud. This emphasis overlooks the basic thrust of the supplemental opinion which explicitly declared that "Even if we were persuaded to change our mind" and find that "Monsanto did not intend to mislead, . . . a specific intent to deceive is not necessary where there is evidence of deliberate withholding of material information." The court also made reference to the admission by Monsanto's counsel: "There is no question it wasn't accidentally left out." 312 F.Supp. at 799. Thus, the alternative ground suggested by the district court in no way negatives the principal basis of its original opinion.

1. 312 F.Supp. 799.

on the ground that it was fraudulently obtained:

These pertinent principles are well-settled:

"Fraud" is never presumed and a party alleging fraudulent procurement of a patent bears a heavy burden of proof. Edward Valves, Inc. v. Cameron Iron Works, Inc., 286 F.2d 933, 947 (5th Cir. 1961), cert. den. 368 U.S. 833, 82 S.Ct. 55, 7 L.Ed.2d 34.[2]

"A finding that a patent was procured by fraud or unclean hands must be based on 'clear, unequivocal and convincing' evidence. United States v. American Bell Telephone Co., 167 U.S. 224, 251, 17 S.Ct. 809, 42 L.Ed. 144 (1897)." Scott Paper Company v. Fort Howard Paper Company, 432 F.2d 1198, 1204 (7th Cir. 1970), cert. den. 401 U.S. 913, 91 S.Ct. 882, 27 L.Ed.2d 812 (1971). *See too* McCullough Tool Company v. Well Surveys, Inc., 343 F.2d 381, 394 (10th Cir. 1965), cert. den. 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966), rehearing den. 384 U.S. 947, 86 S.Ct. 1452, 16 L.Ed.2d 545 (1966); Armour & Co. v. Wilson & Co., Inc., 274 F.2d 143, 148 (7th Cir. 1960); Baldwin-Lima-Hamilton Corporation v. Tatnall Measuring Systems Company, 169 F.Supp. 1, 25 (E.D.Pa. 1958), aff'd on other grounds, 268 F.2d 395 (3rd Cir. 1959), cert. den. 361 U.S. 984, 80 S.Ct. 190, 4 L.Ed.2d 151.

"To successfully assert that intentional misrepresentations were made, *the standard of proof to be met is not a preponderance of the evidence but the intentional misrepresentations must be proved to a reasonable degree of certainty, otherwise the defense of unclean hands cannot be upheld.*" Corning Glass Works v. Anchor Hocking Glass Corporation, 253 F.Supp. 461, 471 (D.Del.1966), modified on other grounds, 374 F.2d 473 (3rd Cir. 1967), cert. den. 389 U.S. 826, 88 S.Ct. 65, 19 L.Ed.2d 80 (emphasis supplied).

"Prejudicial error" is committed when a federal court applies a "preponderance of evidence" standard in making a factual determination with respect to allegations of fraudulent conduct. Barr Rubber Products Company v. Sun Rubber Company, 425 F.2d 1114, 1120–1121 (2nd Cir. 1970), cert. den. 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115.

That the District Court applied a "preponderance of evidence" test in making its fact-findings is evident from the following colloquy[3] relating to the sweep of the burden of proof imposed on a party alleging fraud in the procurement of a patent:

"The Court: Look, if this were a criminal case, Mr. Leydig [Monsanto's counsel], it is very possible as to the intention to deceive a *jury might have a reasonable doubt under all of the evidence in the case.*

"But it is not a criminal case. It is a civil case. *The burden is the preponderance of the evidence,* and I have found that it is *more probable than not.*
"Mr. Leydig: It is more than that, Your Honor.

"The Court: *That is all it is.*" (emphasis supplied).

*Second:* as to the District Court's holding that ". . . *a specific intent to deceive is not necessary* . . . when there is evidence of a deliberate withholding of material information," and that the patent must be rejected "even if the decision not to disclose was motivated by *nothing more than bad judgment as to the materiality of the in-*

---

2. "Fraud is never presumed, and the burden is upon the defendant to show facts constituting fraud by clear, cogent, convincing and certain proof." Equitable Life Assurance Soc. v. Dunn (C.C.A.) 61 F.2d 450, 452." New York Life Ins. Co. v. Kwetkauskas, 63 F.2d 890, 891 (3rd Cir. 1933), cert. den. 289 U.S. 762–763, 53 S.Ct. 793, 77 L.Ed. 1505. To the same effect see McDonnell v. General News Bureau, Inc., 93 F.2d 898, 901 (3rd Cir. 1937).

3. Page 26, transcript of proceedings of April 14, 1970, upon argument of counsel on Monsanto's Motion for a Partial New Trial.

*formation . . .*" [4] (emphasis supplied):

The stated holding is in plain disregard of the settled rule that in order to establish "fraudulent procurement" of a patent intentional fraud must be proved, and *"an honest mistake,"* made *"in good faith,"* does not attain the dimension of intentional fraud. Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). *See, too,* Bendix Corporation v. Balex, Inc., 421 F.2d 809, 819 (7th Cir. 1970), cert. den. 399 U.S. 911, 90 S.Ct. 2203, 26 L.Ed. 2d 562.

It has been specifically held that enforcement of a patent should not be denied "merely because of an innocent or good faith non-disclosure"; "an applicant for a patent should be accorded the right to exercise good faith judgment in deciding what matters are and are not of sufficient relevance and materiality to require disclosure"; and that "[o]nly when he is guilty of fraud, willfulness or recklessness indicating a disregard for his duty of frankness should enforcement of the patent be barred." Xerox Corporation v. Dennison Manufacturing Company, 322 F.Supp. 963, 968–969 (S.D. N.Y.1971).

Significantly relevant to the District Court's holding here that a patent must be rejected "even if the decision not to disclose was motivated by nothing more than bad judgment" is the contrary holding in Tractor Supply Co. v. International Harvester Company, 155 U.S.P.Q. 420 (D.C.N.D.Ill.E.Div.) 1967. There the Court said (p. 433):

"An allegation of 'innocent' misrepresentation concerning the procurement of a patent, coupled with the lack of any proof that the patentee or his assignee acted fraudulently, intentionally, or willfully, is wholly inadequate to render a patent unenforceable in equity against an alleged infringer. To hold otherwise would work a forfeiture of the patentee's property *in the absence of unconscionable or morally reprehensible conduct,* something which equity is always reluctant to do." (emphasis supplied).

*Third:* as to the utter lack of evidence that the Patent Office would not have issued the patent but for the claimed fraudulent conduct:

Federal courts have time and again ruled that a party challenging enforcement of a patent on the ground that it was obtained by material misrepresentations or omissions in the patent application proceedings, must prove by "clear, unequivocal and convincing evidence" that the Patent Office would not have issued the patent but for the claimed misrepresentations or omissions.

4. The District Court, in its Supplemental Opinion denying Monsanto's Motion for a Partial New Trial which was premised largely on the contention that the District Court had erroneously found that "omissions were intentionally and deliberately made" in the patent application proceeding, said:

"As to whether Rohm & Haas has met its burden of proof, we have decided to let the record stand as it is. However, we are compelled to point out that even if we were persuaded to change our mind and find that although there were intentional omissions of fact, Monsanto did not intend to mislead the Patent Office, this would not lead us to a different conclusion with respect to the validity of a patent in light of such omissions. For the same policy considerations which underlie our February 17th Opinion (pages 792–794), *we hold that even if Monsanto did not intend to deceive the Patent Office, the fact that it intentionally withheld facts which were material to the decision whether it was entitled to a patent is sufficient to bar the issuance of a patent . . . even if the decision not to disclose was motivated by nothing more than bad judgment as to the materiality of the information, the patent must still be rejected. We hold that a specific intent to deceive is not necessary to bar a patent when there is evidence of a deliberate withholding of material information.* Of course, if it is found that the facts withheld were not even marginally material to the issues before the Patent Office, then our decision on this precise issue would be different." 312 F.Supp. 799. (emphasis supplied).

In Waterman-Bic Pen Corporation v. W. A. Sheaffer Pen Company, Division of Textron, Inc., 267 F.Supp. 849 (D.Del. 1967), the Court said at page 856:

"A person attacking the validity of a patent for alleged fraudulent representations must prove that the representations were material—*that the patent would not have issued but for the representations.*" (emphasis supplied).

To the same effect, *see* SCM Corporation v. Radio Corporation of America, 318 F.Supp. 433, 448 (S.D.N.Y.1970); Corning Glass Works v. Anchor Hocking Glass Corporation, *supra,* at 253 F.Supp. 469.

It is of the utmost relevance that no specific evidence was adduced below on the critical issue as to whether the Patent Office was misled into granting the patent by virtue of any omissions in the Husted affidavit. The District Court's conclusion that the Patent Office was thereby misled was based solely on "inference." On that score, it has been squarely held that "inference" cannot be substituted for "clear and convincing proof" in determining whether the Patent Office has been misled by material misrepresentations or omissions. Nashua Corporation v. RCA Corporation, 307 F. Supp. 152 (D.N.H.1969), aff'd 431 F.2d 220 (1 Cir. 1970). There, the District Court, in rejecting a claim that the patent applicant withheld material information in an affidavit submitted to the Patent Office, said:

"There is no evidence *as to how this affidavit was interpreted and understood by the Patent Examiner and there is no evidence as to what extent, if any, the Patent Examiner relied on it. This, perhaps, may be inferred, but an allegation of fraud requires clear and convincing proof and should not be based on inferences.*" 307 F. Supp. 158. (emphasis supplied).

*Fourth:* the District Court's fact-findings that there was a "deliberate with-

holding" of "material" information, were clearly erroneous inasmuch as they were the fruit of an inapplicable "preponderance of the evidence" standard of proof:

The record below fails to disclose any evidence that the facts withheld from the Patent Office were "material" to the granting of the patent. That the District Court was aware of the vulnerability of its fact-finding that the withheld information was "material" is apparent from its statement in sub-section (c) of its Conclusions of Law No. 2:

"Even if the facts withheld from the patent office were not material, Monsanto has come into court with unclean hands." 312 F.Supp. 798.

The record further contains no factual evidence that there was a "deliberate withholding" of information. There was, however, affirmative testimony by the then counsel for the patent applicant that the omitted data was not included in the Husted affidavit because in his opinion it was not material. This testimony was not challenged nor was it impeached.

It is pertinent to note that in Monsanto Company v. Dawson Chemical Company, 312 F.Supp. 452 (S.D.Tex.1970)[5] the District Court, with knowledge of the Opinion in the instant case, rejected similar allegations of fraudulent procurement of the Monsanto Huffman patent, on its finding that they were not supported by "clear, unequivocal and convincing" evidence.

In that case, the District Court said in relevant part at page 462:

"The law is settled that the proof of fraud must be clear, unequivocal, and convincing and a mere preponderance of the evidence which leaves the issue in doubt may not properly be a basis for a finding of fraud. Baldwin-Lima-Hamilton Corp. v. Tatnall Meas. Sys. Co., *supra,* 169 F.Supp. p. 25. When these guidelines are applied to the present case, the inescapable conclusion

5. Reversed and remanded, 443 F.2d 1035 5th Cir. 1971), in light of Blonder-Tongue Laboratories, Inc. v. University of Illinois

Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788, 1971. *See* n. 4, Majority Opinion, *supra.*

is that defendants have failed in their burden of proof. The only misinformation presented to the Patent Office is the degree of phytotoxicity of 3,4–DCPA on radishes. There is no evidence that this small corner of a broad picture presented to the patent examiner materially influenced the decision to grant the patent. The remaining contention on unclean hands relates not to what was said, but rather to what was not said. Defendants have not established that the withholding of this information was done with intent to deceive the Patent Office. They have similarly failed to prove the materiality of the information withheld, that the patent examiner would have rejected the application had he known of the matters said to be withheld as was true in Charles Pfizer & Co. v. FTC, *supra*. To overcome the initial rejection by the patent examiner, it was necessary for plaintiffs to convince her that 3,4–DCPA had properties neither predictable from, nor in fact possessed by, 3,4–DCAA. By the manner in which they went about this task, plaintiffs did nothing more than put their best foot forward. Defendants' contentions on this point are therefore without merit."

This, too, must be said with respect to the majority's reliance on Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). There the evidence conclusively established that the patent in suit had been obtained by fraud, intentionally concealed from the Patent Office with intent to deceive. *Precision*, accordingly, is inapposite on its facts.

The majority has found it necessary to reach only the misrepresentation issue. I have accordingly confined this dissent to that issue. It is meet that I should say that I would also reverse the District Court's Judgment insofar as it is premised on its holdings that the Monsanto Huffman patent is invalid because it is "obvious" and "anticipated," and unenforceable because of "laches."