**SALOMON SMITH BARNEY INC.,**

**v.**

**Stewart M. VOCKEL, III.**

**No. CIV. A. 00–2217.**

United States District Court,
E.D. Pennsylvania.

May 8, 2000.

As Amended May 9, 2000.

Chad T. Wishchuk, Mc Aleese, Mc Goldrick & Susanin, P.C., King of Prussia, PA, for Salomon Smith Barney, Inc.

**600**

Stephen J. Mathes, Hoyle, Morris & Kerr, Philadelphia, PA, for Stewart M. Vockel, III.

## MEMORANDUM

BARTLE, District Judge.

Before the court is the motion of plaintiff Salomon Smith Barney Inc. ("Smith Barney") for a preliminary injunction against one of its former financial consultants,[1] Stewart M. Vockel, III ("Vockel"), who resigned from Smith Barney on April 28, 2000. We have subject matter jurisdiction under 28 U.S.C. § 1332.

In addition to this action, Smith Barney has instituted an arbitration proceeding against Vockel under the rules promulgated by the National Association of Securities Dealers. In that proceeding Smith Barney seeks, among other things, a monetary award. Until the dispute between the parties can be arbitrated on the merits, Smith Barney asks this court to restrain Vockel from using, disclosing, or misappropriating Smith Barney's customer information, to compel Vockel to undo account transfers for any former Smith Barney accounts he successfully caused to be transferred to his new employer, and to require Vockel to return all documents containing Smith Barney client information. The complaint does not seek a permanent injunction or other relief.

We denied the request for a temporary restraining order on May 1, 2000. On May 3, 2000, we held a preliminary injunction hearing.

In order to obtain the extraordinary remedy of a preliminary injunction, Smith Barney must establish that there is a reasonable likelihood that it will succeed on the merits and that it is reasonably likely to suffer irreparable harm if relief is denied. We must also consider whether injunctive relief will cause the defendant irreparable injury and whether granting the preliminary relief is in the public interest. See Adams v. Freedom Forge Corp., 204 F.3d 475, 484, 487 (3d Cir.2000).

## I.

Based upon the evidence presented at the May 3, 2000 hearing, held in accordance with Rule 65 of the Federal Rules of Civil Procedure, we find the following.

Stewart Vockel has worked as a bond trader or financial consultant for a number of years. Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") hired him as a financial consultant in 1991. He left Merrill Lynch and started with the Philadelphia branch of Smith Barney in November, 1994.[2]

In late January, 2000, Vockel approached his long-time acquaintance Elliott Goodfriend, who is the Philadelphia Branch Manager for Paine Webber Inc. ("Paine Webber"), about the possibility of moving from Smith Barney to Paine Webber. On approximately March 28, 2000 Paine Webber made Vockel an offer of employment, which included a sizeable signing bonus. Vockel accepted.

In early April, approximately one week after Vockel received the offer, the administrative manager in Paine Webber's Philadelphia office, Jim Checksfield, told Vockel that Paine Webber needed his Smith Barney client account statements. On or about April 19, 2000, while still employed by Smith Barney and without asking for permission from it or any of his clients, Vockel provided to Paine Webber the account statements for 254 of the 470 accounts he was servicing at Smith Barney.

---

**1.** A financial consultant is synonymous with a stockbroker.

**2.** Vockel was hired by Smith Barney, Harris Upham & Co. Inc., a predecessor in interest of Salomon Smith Barney.

Paine Webber forwarded this material to an outside firm which, at Paine Webber's expense, prepared solicitation packages and then mailed them to the account holders. The solicitation package contained a cover letter drafted and signed by Vockel, an account transfer form with each client's Smith Barney account number(s) preprinted on it, and a Paine Webber "new account" form.

The solicitation packages were mailed, via overnight delivery, on Friday, April 28, 2000.[3] That same day, in the late afternoon, Vockel submitted his letter of resignation to Smith Barney. He took with him newly printed gain and loss statements for all of the Smith Barney accounts he had serviced and a "household list," which showed the total assets, monthly activity, and gains and losses for each of his Smith Barney accounts. Vockel spent the weekend calling his clients. He told them about his move to Paine Webber and explained that they soon would be receiving solicitation packages that would enable them to transfer their accounts to his new employer.

This was not the first time Vockel had solicited his clients to transfer their accounts to his new place of employment. As noted above, from 1991 through October, 1994, Vockel worked at Merrill Lynch before moving to Smith Barney. At the time he left Merrill Lynch, he had been managing accounts worth approximately $23 million. Sometime between August and October, 1994, after initial discussions with John Adamiak, the Branch Manager of Smith Barney's Philadelphia office, Vockel received a job offer. The Smith Barney offer, like his recent Paine Webber offer, included a substantial signing bonus.

Adamiak told Vockel that Smith Barney wanted his Merrill Lynch client account statements, which Vockel provided to Smith Barney while still a financial consultant at Merrill Lynch. Adamiak told Vockel to resign from Merrill Lynch late in the day on a Friday afternoon. He did so on October 28, 1994. That same day a solicitation package, arranged and paid for by Smith Barney, was mailed to each of the clients Vockel had advised while at Merrill Lynch. The package contained an account transfer form and a letter signed by Vockel, which had been jointly drafted by Vockel and Adamiak, that informed Vockel's Merrill Lynch clients of his move to Smith Barney. The letter also urged them to transfer their accounts. Vockel used the October, 1994 solicitation letter as a model when he drafted his April, 2000 cover letter. In fact, the two letters are nearly identical.[4]

When Vockel resigned from Merrill Lynch in 1994, the firm either instituted or threatened suit. Smith Barney participated in the settlement of the matter.

As a result of the joint solicitation efforts of Vockel and Smith Barney in 1994, nearly all of Vockel's Merrill Lynch clients transferred their accounts. Approximately 60% of the accounts he oversaw at Smith Barney followed him from Merrill Lynch, and another 30% of his accounts resulted from referrals from those clients who had followed him from Merrill Lynch to Smith Barney. When he left Smith Barney on April 28, 2000, he was managing approximately 470 accounts worth a total of approximately $70 million, and annually these accounts generated over $500,000 in commissions.

---

**3.** There were 254 accounts covered by the solicitation packages, but only 185 packages, because some clients held more than one account.

**4.** Smith Barney did not attempt to contradict Vockel's testimony about the 1994 events. While Mr. Adamiak was present in the courtroom at the May 3, 2000 hearing, he did not testify.

In the course of his tenure at Smith Barney, Vockel had access to its computerized database that contained information about the clients he served, including their names, addresses, phone numbers, cash balances, asset values, investment habits, portfolio details, and monthly account activity. Vockel also made use of Smith Barney's investment products, research tools and data, support staff, equipment, and office space.

At about the time he joined Smith Barney, Adamiak told Vockel that Merrill Lynch differed from Smith Barney in that Merrill Lynch considered clients *"theirs"* while Smith Barney knew clients were the *"broker's"* and was there to help the broker service his or her clients' accounts. Nonetheless, in November, 1994, Vockel signed a "Principles Of Employment" agreement with Smith Barney that provided:

> [Y]ou must never use (except when necessary in your employment with us) nor disclose with anyone not affiliated with [Smith Barney] ... any confidential or unpublished information you obtain as a result of your employment with us. This applies both while you are employed with us and after that employment ends. If you leave our employ, you may not retain or take with you any writing or other record which relates to the above.

Vockel also signed an "Employee Acknowledgements" [sic] form wherein he promised:

> I will not publish or otherwise disclose, or use for other than Smith Barney's benefit, either during or after my employment, any unpublished or proprietary or confidential information or secret relating to Smith Barney or its affiliates or any of their businesses or operations, nor will I publish or otherwise disclose proprietary or confidential information of others to which I have had access or obtained knowledge in the course of my employment. If I leave the employ of Smith Barney I will not, without its prior written consent, retain or take with me any writing or other record in any form or nature which relates to any of the foregoing.

In addition, in November, 1994, Vockel signed an "Acknowledgment" form which stated that he had received, read, and understood Smith Barney's Code of Ethics and that he agreed "to comply fully with the standards contained in the Code and all of Smith Barney's other policies, rules and procedures (including those set forth in the Smith Barney Employee Handbook)." Although Smith Barney did not produce its employee handbook that was in effect in 1994, its 1998 and 1999 employee handbooks contained provisions about confidentiality similar to those quoted above. Throughout his period of employment, Smith Barney distributed reminders to its employees concerning their continuing obligation to maintain the confidentiality of client information and client lists. Significantly, however, Vockel never signed a non-compete agreement.

## II.

Even assuming that Smith Barney would otherwise be entitled to a preliminary injunction, Vockel contends that it should be denied because Smith Barney does not come into the court with clean hands. The Supreme Court has declared, "It is one of the fundamental principles upon which equity jurisprudence is founded, that before a complainant can have a standing in court he must first show that not only has he a good and meritorious cause of action, but he must come into court with clean hands." *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 244, 54 S.Ct. 146, 78 L.Ed. 293 (1933) (internal quotation marks and citation omitted). The Court has cautioned that

we must not be made "the abettor of iniquity." *Id.* at 245, 54 S.Ct. 146 (internal quotation marks and citation omitted).

■ In further explaining the application of the equitable maxim of clean hands, the Supreme Court stated, "The governing principle is that whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine." *Id.* at 244–45, 54 S.Ct. 146 (internal quotation marks and citation omitted). The rule is not without its limitations. We are not to consider misconduct that has no connection to the case at hand. Rather, any "unconscionable act" of the plaintiff must have "immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *Id.* at 245, 54 S.Ct. 146; *see also In re New Valley Corp.*, 181 F.3d 517, 525 (3d Cir.1999), *cert. denied* 528 U.S. 1138, 120 S.Ct. 983, 145 L.Ed.2d 933 (2000).

Plaintiff has painted a picture of Vockel making off with valuable client information in order to woo them surreptitiously and expeditiously to his new employer, one of Smith Barney's arch competitors, and doing so in a manner that made it nearly impossible for Smith Barney to prevent the loss of valuable business. If it does not obtain preliminary relief in this case, argued Smith Barney, clients will be hoodwinked into transferring accounts without realizing what they are doing. According to Smith Barney, competing brokerage firms might be encouraged to lure its brokers away and deprive it of business in which it had invested so many resources to develop.

■ Unfortunately for Smith Barney, in determining the issue of clean hands, we look solely at the conduct of the plaintiff—the one who seeks the aid of the chancellor—and not the conduct of the defendant.

As the Court of Appeals observed in *Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592, 598 (3d Cir.1972), "This maxim [of clean hands] is far more than a mere banality. It is a self–imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, *however improper may have been the behavior of the defendant.*" (emphasis added).

It is undisputed that in 1994 Smith Barney secretly encouraged and aided Vockel to engage in the same unconscionable behavior of which it now complains. For over five years, Smith Barney has shared in the gains of its unconscionable conduct. At the time it hired Vockel, Smith Barney showed no respect for the confidential nature of Merrill Lynch's client data. It obtained information about Vockel's Merrill Lynch clients and prepared solicitation packages in advance of his departure from Merrill Lynch. It instructed Vockel to resign from Merrill Lynch late on a Friday afternoon and to begin contacting his clients immediately in order to persuade them to transfer their accounts to Smith Barney. It also provided Vockel with a significant signing bonus for joining the firm.

■ Smith Barney seeks the help of a court of equity to prevent the same conduct by Vockel which it had previously abetted and from which it has handsomely profited. Now it wants the court to prevent the loss of that profit. If what Vockel is doing in 2000 is wrong, it is hard to see why Vockel's and Smith Barney's conduct in 1994 was not wrong. At the very least, Smith Barney is "tainted with inequitableness or bad faith relative to the matter in which [it] … seeks relief." *Monsanto*, 456 F.2d at 598. The misdeeds of Smith Barney have an "immediate and necessary relation to the equity that [it] … seeks" in

this case. *Keystone Driller,* 290 U.S. at 245, 54 S.Ct. 146. The circumstances here are analogous to a patentee obtaining a patent by deceit or misrepresentation and then attempting to enforce it. In those instances, the Supreme Court and our Court of Appeals denied help to the plaintiff because of unclean hands.[5] *See id.* at 241–46, 54 S.Ct. 146; *Monsanto,* 456 F.2d at 594–601.

While we do not condone the behavior of Vockel, it is the behavior of Smith Barney on which we must focus here. *See Monsanto,* 456 F.2d at 598. Simply put, Smith Barney has not shown that it has come into this court with clean hands. In fact, the opposite has been established. Accordingly, as a court sitting in equity, we will not aid a wrongdoer. We will leave the parties to their monetary and other remedies before the National Association of Securities Dealers.[6]

### III.

The motion of Salomon Smith Barney Inc. for a preliminary injunction will be denied.

### ORDER

AND NOW, this ___ day of May, 2000, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the motion of plaintiff Salomon Smith

Barney Inc. for a preliminary injunction is DENIED.

---

5. Bispham's *The Principles of Equity* explains: About the earliest illustration of this doctrine [of clean hands] is almost traditional in the famous case of *The Highwayman.* Lord Kenyon once said, by way of illustration, that he would not sit to take an account between two robbers on Hounslow Heath, and it has been questioned whether the legend in regard to the highwayman did not rise from that saying. It seems, however, that the case was a real one. The highwayman did file a bill in equity for an accounting against his partner; but the bill (it is needless to say) was promptly dismissed; and, moreover, the plaintiff's solicitors were summarily dealt with by the court as for a contempt in bringing such a case before it. Geo. Tucker Bispham, *The Principles of Equity* 71–72 (9th ed.1916).

6. While we have used such phrases as "his clients" and the "Smith Barney accounts," we are making no specific determination as to the rights of the parties with respect to the clients or the accounts.