SCOTT PAPER COMPANY, Plaintiff-Appellant and Cross-Appellee,

v.

FORT HOWARD PAPER COMPANY, Defendant-Appellee and Cross-Appellant.

Nos. 17569, 17570.

United States Court of Appeals, Seventh Circuit.

Sept. 4, 1970.

---

Arthur G. Connolly, Wilmington, Del., James P. Brody, Foley, Sammond & Lardner, Milwaukee, Wis., for plaintiff-appellant; William J. Foley, Philadelphia, Pa., Earl Christensen, James M. Mulligan, Jr., Connolly, Bove & Lodge, Wilmington, Del., of counsel.

Paul J. Schierl, Green Bay, Wis., George ᵧB. Newitt, George P. McAndrews, Molinare, Allegretti, Newitt & Witcoff, Chicago, Ill., Arthur L. Morsell, Milwaukee, Wis., for defendant-appellee; Morsell & Morsell, Milwaukee, Wis., of counsel.

Before MAJOR, Senior Circuit Judge, KILEY, Circuit Judge, and ESCHBACH, District Judge.[1]

KILEY, Circuit Judge.

Scott Paper Company (Scott) appeals from a judgment against it in this patent infringement action. Fort Howard Paper Company (Fort Howard) cross-appeals from the district court ruling denying it attorney fees. We affirm the judgment and ruling.

Scott is a Pennsylvania, and Fort Howard a Wisconsin, corporation. The patent in suit, No. 2,834,809, issued May 13, 1958.[2] On August 26, 1960, Scott filed the present suit, charging that Fort Howard Brand 296 infringed the patent in suit. Defendant's answer denied infringement and affirmatively charged invalidity, patent misuse and unclean hands. The district court found infringement if the patent is valid, but sustained the affirmative defense of invalidity on the ground of obviousness in view of the prior art. The court decided also that Scott was not guilty of fraud

---

1. Judge Eschbach of the United States District Court, Northern District of Indiana, is sitting by designation.

2. The patent issued to Richard W. Schutte, Kenneth W. Britt and Albert L. McConnell who assigned the patent to Scott.

upon the Patent Office or of unclean hands and denied Fort Howard's claim for attorney fees.

The patent in suit contains eighteen claims describing paper structure (Claims 3–18) and a method for forming paper into that structure (Claims 1–2). Although no particular end use was claimed in the patent, the paper was designed to be used as an industrial paper towel having the necessary attributes of bulk, durability, and high oil absorbency and oil storage capacity. As indicated in the specifications, the paper contemplated by the patent is an absorbent paper for use as towels and wipers and particularly suitable as a disposable industrial wiper capable of substituting for cloth industrial wipers. The attributes noted are obtained by pressing two or more sheets of paper between two identical mesh screens or between two rolls having screen-like patterns engraved on the surfaces.

This process has the effect of creating crests and depressions in the paper, with the crest on the one side forming the depression on the other side and vice versa. On the sloping areas between the crests and depressions, the paper is ruptured by the working of the screens or rolls.[3] The indentations in the paper act as scrapers to scoop up grease and oil; the fibrous strands of shredded paper protruding from the ruptures serve as wicks to absorb and direct fluids to the interior of the paper where it is gathered in the unworked crests and depressions. The following diagram graphically illustrates the structure of the Schutte invention.

[A 2606]                   Figure 1[4]

The working of only the slopes of the paper creates an effective bond between the layers of paper, thereby providing the bulk necessary for machine wiping. At the same time, by limiting the ruptures and apertures to 10% of the total area, the paper absorbed oil satisfactorily without sacrificing durability, which was the main hurdle in the development of a good industrial paper.[5]

The two method claims[6] involved in the suit concern the process of manufac-

3. Claim 3 is representative of the product claims:

> Paper having a plurality of crests and depressions in each side thereof, the depressions in one side forming the crests on the other side and the crests on the one side forming depressions in the other side, sloping connecting portions intervening crests and depressions, the paper being ruptured in areas which form said sloping connecting portions, said paper including substantial areas which are not ruptured.

Product Claims 4–18 only slightly vary the language of Claim 3. Claims 4–6 describe the sloping areas as being worked beyond the elastic limit (Claim 4), as compressed (Claim 5), and as having apertures (Claim 6). Claims 7–10 describe the working as being in slopes between "most nearly adjacent crests and depressions." Claims 11–14 describe a two-ply product. Claims 15–18 describe paper undulating in cross-section with a substantially greater thickness than that of the base stock from which the paper was formed and having a compressibility factor of at least 2 to 1 at a pressure of 21 pounds per square inch.

4. At the trial, sample papers were viewed through a stereo-microscope in order to observe the markings in this diagram.

5. Absorbency and durability were generally considered incompatible, because, as a rule, a good absorbent material must be porous, but a highly porous product usually lacks strength and durability. Efforts to increase the strength of such a product by compressing multiple thicknesses together resulted in an overall compression of the sheet and consequent loss of absorbency. Brief for appellant, pp. 8–9, Scott Paper Co. v. Fort Howard Paper Co.

6. Claim 2 is representative of the method claims:

> The method of forming bulky paper from base stock which method comprises supporting two rolls having substantial-

turing the product by passing paper between two matched rolls upon which are engraved identical screen-like patterns. The unique feature of this device claimed by plaintiff is the specification that the distance between the surfaces of the rolls must be less than the thickness of the processed paper only in the sloping areas (28 and 29 of Figure 2) so that paper is worked beyond its elastic limit only in those areas; and that the clearance between each crest (24) on one roll and matching depression (25) on the other roll must exceed the thickness of the base stock so that the paper is left unworked in the crests and depressions.

**Figure 2**

[A 2607]

## PRIOR ART

When the application for the patent in suit was filed, there was well known in the art the embossing of paper; the fact that perforation or working of a properly selected paper and consequent exposure of fiber ends increased absorbency,[7] *see, e. g.,* Milliken Patent No. 2,281,945 (paper napkin), Jaeger Patent No. 495,976 (blotting paper), Conradson Patent No. 1,384,515 (paper towel); and the process of pressing specially selected paper between wire screens in order to achieve a perforation-embossing, or ruptured-worked effect.

Crane Patent No. 118,204 describes a method of treating bank checks to prevent and detect alteration by placing the completed check between two pieces of wire cloth and passing the resultant "sandwich" between two rollers, causing minute embossing and perforating in the paper. Oldofredi Patent No. 2,370,186 describes a method of imprinting decorative designs on paper or other material by passing the paper or material between two wire screens.

The prior art, however, contained no use of the wire screen perforation-embossing method to form absorbent paper wipers, and neither the Crane nor Oldofredi patents were cited to, or considered by, the Patent Office in the prosecution of the application.

## THE FINDINGS OF THE DISTRICT COURT

The district court found that the Crane and Oldofredi patents in the prior art disclosed both the method and the structure in the claim of the Scott patent, and that no presumption of validity of the patent exists in light of these undisclosed prior art patents.

The court recognized that there were "details" in the claims not specifically mentioned in either Crane or Oldofredi. However, the court thought that such details as "the location of the working and failure to work substantial areas are inherent" in the wire screen embossing art. The court stated that Scott's patent merely adapted Crane and Oldofredi to different paper stock and used coarser screen mesh. This adaptation, concluded the court, would be obvious to a person

ly identical patterns including high and low areas formed thereon in juxtaposition so that the high areas on one roll extend into the low areas on the other roll and so that the distance between the surfaces of the rolls is less than the thickness of the base stock only in the sloping areas intervening the high and low spots on each roll, and passing the base stock between the rolls to deform the paper and to work it beyond the elastic limit of the paper in the said sloping areas between the high and low spots on the rolls, while leaving undeformed substantial areas of said paper.

7. The working of paper to expose fiber ends forming wicks is not claimed by Scott as its invention.

skilled in the art and did not rise to the status of a patentable invention.

We agree with the district court that both Crane and Oldofredi disclose the method and structure in the plaintiff's claims. Both teach a method of embossing paper and other material by placing it between two wire screens and applying pressure to the resultant "sandwich." [8] Both also describe the paper as having perforations when removed from the rollers.[9]

Oldofredi states that weavelike elevations will appear in the pressed paper, and if sufficient pressure is applied the paper will be perforated in the areas adjacent to the elevations. The paper, of course, would remain unworked and unperforated in the elevations since these areas have passed through the interstices of the screen. Crane teaches that rollers engraved with a proper formation may be substituted for the wire gauze.

Scott argues that its patent differs from or improves on the Crane and Oldofredi devices in that the roller apparatus is designed so that the distance between the surfaces of the roller is less than the thickness of the paper only in the sloping areas between the intervening high and low spots. This process produces a bulky paper product with ruptures and apertures only in the sloping areas, leaving substantial areas unworked.

We think however that the trial court did not err in finding that these details, although not specifically mentioned in the Crane and Oldofredi claims, inhere in the use of wire screen in the embossing operations. The specifications with respect to the roller apparatus merely describe a roller with a screen-like formation engraved thereon. This was substantially taught by Crane. The ruptures and apertures in the sloping areas and the unworked depressions and elevations of the paper structure would inevitably result when selected paper is compressed between two screens of suitable mesh and diameter. We think that the trial court could reasonably find that this is a matter that would be obvious to a person skilled in the art. The broad specifications of permissible screen sizes contained in the Scott patent imply this.[10] We think too that the correct alignment of the screens could also reasonably be found to be obvious to a person skilled in the art. The absence

---

8. "The check or draft, having been filled up and signed in the usual way, is placed between two pieces of wire cloth, or wire gauze, and with them introduced between two metal pressure rollers and rolled between them by turning the said rollers." Crane Patent No. 118,204, Col. 1, lines 31–36.

Oldofredi Patent No. 2,370,186, p. 6, Col. 2, lines 9–18 states:

\* \* \* [W]hat I claim as new and desire to be secured by Letters Patent is as follows:

1. An Article for reproducing a three-dimensional design comprising a wire fabric the upper and lower surfaces of which having depressions symmetrical to and opposite each other.

2. A method of embossing sheet material, which comprises pressing said material with a wire mesh die having a compacted design area.

9. "[The invention] consists in subjecting \* \* \* papers \* \* \* to a perforating, embossing, or indenting process by which the fiber or texture of the paper is so cut, broken up, or affected as to make it difficult to write upon." Crane Patent No. 118,204, Col. 1, lines 15–22.

"When the check or draft is removed from between the pieces of wire-cloth or wire gauze, it will be found to be minutely embossed all over, and also full of very fine perforations." *Id.* at lines 36–39.

Oldofredi Patent No. 2,370,186, p. 5, Col. 1, lines 7–15, states:

By regulating the pressure of the rollers, any degree between superficial, slight indentation and a deep impression may be obtained. The latter effect resembles perforation, the many minute junctions of warp and shute performing a function similar to a function performed by an equal number of perforating needles, and puncturing the final material.

10. "An operative wire screen has a 12 x 12 mesh and is made of wire .047 inch in diameter, but screen of other mesh and wire-diameter may be used. For instance, the mesh may vary from a mesh of 6 x 6 to 24 x 24 with wire-diameter ranging from .023″ to .072″." Schutte, et al. Patent No. 2,834,809, Col. 3, lines 31–35.

of any teaching in the Scott patent on using the wire screen in any way different from the prior art strengthens this conclusion.

Scott also contends that the Crane and Oldofredi prior art patents do not suggest its patent since they differ extensively from the Scott patent in objectives, problems to be solved and end product: Essentially, it argues that its patent has for its object use as an industrial wiper with the necessary attributes of bulk, strength, durability and oil absorption and storage capacity; and that Crane and Oldofredi were not designed for and would not have the necessary qualities of a workable industrial wiper.

■ The validity of a patent cannot be predicated upon the extra-claim qualities of the paper structure since functional statements cannot be used to define over the prior art. Mead Johnson & Co. v. Hillman's Inc., 135 F.2d 955, 957–958 (7th Cir. 1943). The functional distinctions over the prior art are to be set out in the specifications to prove the required utility of the invention, rather than to define it.[11]

■ The validity of a patent cannot be upheld, either, on the basis of an end use of the invention. Use as an industrial wiper is not mentioned in any of the claims of the patent in suit, and the plaintiff, in restricting the scope of the invention to the claims, specifically disclaimed any end use. Moreover, the district court found that the plaintiff's particular use of the anticipated claims would have been obvious to one skilled in the art, and no evidence has been presented to persuade us that this conclusion was erroneous. Finally, Oldofredi contemplated the use of his device for other purposes.

The easy attachability of wire fabrics to any kind of press or pressure roller * * * leads to the application of this method to mechanical appliances not yet used for three-dimensional working, and to the combination of it with printing and other paper working processes. In addition it may be applied to standard equipment of other industries. Oldofredi Patent No. 2,370,186, p. 6, Col. 1, lines 6–19.

■ The record supports the district court's conclusion that the Scott patent has merely adapted an old method to a new use by modifications obvious to one skilled in the art, which does not constitute a patentable invention. Triangle Conduit & Cable Co. v. National Elec. Prod. Corp., 149 F.2d 87 (3rd Cir.), cert. denied 326 U.S. 744, 66 S.Ct. 59, 90 L.Ed. 444 (1945).

■ Scott challenges the conclusion of obviousness on the ground that the court failed to award the presumption of validity to its patent under Section 282 of the Patent Code (35 U.S.C. § 282). The presumption of validity of a patent, however, does not apply to prior art not cited to the Patent Office, Hobbs v. Wisconsin Power & Light Co., 250 F.2d 100, 105 (7th Cir. 1957), cert. denied 356 U.S. 932, 78 S.Ct. 774, 2 L.Ed.2d 762 (1958), and even one prior art reference not cited to the Patent Office can suffice to overcome the presumption, Simmons Co. v. Hill-Rom Co., 352 F.2d 886, 888 (7th Cir. 1965). There is no basis for the challenge.

■ Scott also argues that the court erred in failing to consider, and make findings concerning, the long felt need and commercial success of the patented invention, the failure of its competitors in the art to develop a means of producing a satisfactory wiper, and the imita-

---

11. Although the claims and specifications of the patent are often read together, Scott specifically requested that no reference be had to the specifications to limit or to any way restrict the claims of the patent:

> [I]t is therefore desired that the present embodiment be considered in all re-

spects as illustrative and not restrictive, reference being had to the appended claims rather than to the foregoing description to indicate the scope of the invention.
Schutte et al. Patent No. 2,834,809, Col. 6 lines 3–7.

tion of the product by the defendant within a short time after the product was placed on the market. We think that even if the trial court failed to consider such factors it would not require reversal. A similar argument was rejected by this court in T. P. Laboratories, Inc. v. Huge, 371 F.2d 231, 236 (7th Cir. 1966).[12]

And in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965), the Supreme Court, in its first construction of Section 103 dealing with the obviousness of an invention, stated that the primary inquiry was to be "the scope and content of the prior art," "[the] differences between the prior art and the claims at issue," and "the level of ordinary skill in the pertinent art"; "[a]gainst this background, the obviousness or nonobviousness of the subject matter is determined." 383 U.S. at 17, 86 S.Ct. at 694. The Supreme Court went on to hold the patent invalid in spite of the "secondary considerations" of the invention's commercial success, long felt want and the failure of others to produce the invention. We find no merit in Scott's contention that the court erred with respect to "secondary considerations."

Furthermore, the record discloses two producers of paper towels had successfully marketed an industrial wiper [13] and that they presently control a percentage of the industrial paper market that is relatively proportionate to their overall size vis-à-vis Scott. And the plaintiff was unable to cite any paper company which had unsuccessfully attempted to produce an industrial towel. The inexperience of the inventors in the embossing art [14] and the discovery of the invention within a month [15] after the inventors were assigned to the project lend additional support to the trial court's finding of obviousness.

## FORT HOWARD'S CROSS-APPEAL

Fort Howard cross-appeals from the district court's holding that Fort Howard failed to prove that Scott was guilty of fraud or unclean hands by failing to cite Crane and Oldofredi to the Patent Office and claims error in denial of attorney fees under 35 U.S.C. § 285 for plaintiff's "exceptional conduct."

■ A finding that a patent was procured by fraud or unclean hands must be based on "clear, unequivocal and convincing" evidence. United States v. American Bell Telephone Co., 167 U.S. 224, 251, 17 S.Ct. 809, 42 L.Ed. 144 (1897). The same standard of proof applies to the charge of unclean hands. Armour & Co. v. Wilson & Co., 274 F.2d 143, 148 (7th Cir. 1960); Tractor Supply Co. v. International Harvester Co., 155 U.S.P.Q. 420, 433–34 (N.D.Ill.1967). Unclean hands can be asserted only if there has been a deliberate misrepresentation in the Patent Office. Baldwin-Lima-Hamilton Corp. v. Tatnall Meas. Sys. Co., 169 F.Supp. 1, 21 (E.D.Pa. 1958).

■ Here there was no finding by the court that Scott was guilty of deliberate misrepresentation. The finding is that Scott was aware of Crane and Oldofredi and failed to describe them to the Patent Office. Since there is sufficient evidence in the record that Scott, in good

---

12. "Plaintiff also argues that the longfelt need and commercial success of these patents and the failure of others to produce the inventions earlier demonstrate that the Kisling inventions were not obvious. Such secondary factors may sometimes tip the scales toward patentability, but they have little weight here where 'the limited claims of the * * * patent[s] are clearly evident from the prior art as it stood at the time of the invention.' Graham v. John Deere Co., 383 U.S. at 36, 86 S.Ct. at p. 703."

13. Kimberly-Clark's "Kim-Wipes" and Crown Zellerbach's "Kaypees."

14. Mr. Richard Schutte, the main inventor of the patented device, testified that his experience with embossing occurred almost concurrently with his assignment to the project and Mr. A. L. McConnell, one of his two co-patentees, testified that his experience with embossing was "very limited."

15. The program was begun in May, 1952, and the device invented in June, 1952.

faith, disagreed with Fort Howard and the court as to the pertinence of Crane and Oldofredi, we are of the view that reversal is not required. This is not a case where the non-disclosed prior art is almost identical with the patentee's invention, and therefore the cases cited by Fort Howard are inapposite.

 The absence of the requisite finding of deliberate misrepresentation is fatal also to defendant's reliance on the oath of inventorship, 35 U.S.C. § 115, required of patent applicants, in support to its contention that plaintiff was guilty of fraud and unclean hands in its application before the Patent Office. Although the application for a patent "requires the highest degree of candor and good faith," Kingsland v. Dorsey, 338 U.S. 318, 319, 70 S.Ct. 123, 124, 94 L.Ed. 123 (1949), and patent applicants have an "uncompromising duty to report to [the Patent Office] all facts concerning possible fraud or inequitableness underlying the applications in issue," Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945), the burden of proving fraud is not lightened by 35 U.S.C. § 115. *See* United States v. Standard Electric Time Co., 155 F.Supp. 949, 952 (D.Mass.1957), app. dism. 254 F.2d 598 (1st Cir. 1958).

This court in Sarkes Tarzian, Inc. v. Philco Corp., 351 F.2d 557, 560 (7th Cir. 1965), stated: "We think it is well established, at least in this Circuit, that attorneys fees should not be awarded under 35 U.S.C. § 285 except to prevent gross injustice and where fraud and wrong-doing are clearly proved." There is no showing that this is an exceptional case.

We do not deem worthy of discussion Fort Howard's final contention, raised for the first time in its reply brief, that the district court erred in its ruling on the admissibility of certain documents. The court did not abuse its discretion in this ruling.

Affirmed.