**FEED SERVICE CORPORATION,**
**Plaintiff-Appellee,**

v.

**KENT FEEDS, INC., and Grain**
**Processing Corporation,**
**Defendants-Appellants.**

**Nos. 75–1188, 75–1189.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 21, 1975.

Decided Jan. 5, 1976.

Rehearing and Rehearing En Banc
Denied March 19, 1976.

Plaintiff's patent in suit was issued October 1, 1957, as Patent No. 2,808,332 (the '332 patent), entitled "Process For Feeding Ruminants And Improved Feed Supplement Therefor." The patent was issued on an application filed February 17, 1955, by Philip C. Anderson and Janet L. C. Rapp, co-inventors. Anderson was president of plaintiff and Dr. Rapp was plaintiff's Director of Laboratories. The patent was assigned to and at all relevant times was owned by plaintiff.

The patent in suit expired during the pendency of this proceeding, on October 1, 1974. No question concerning injunctive relief is an issue here.

Fred T. Williams, John J. Cavanaugh, Chicago, Ill., for defendants-appellants.

Thomas Cifelli, Jr., Maplewood, N. J., Albert W. Bicknell, Chicago, Ill., for plaintiff-appellee.

Before STEVENS, Circuit Justice *, FAIRCHILD, Chief Judge, and HASTINGS, Senior Circuit Judge.

HASTINGS, Senior Circuit Judge.

This is an action for patent infringement with a counterclaim for a declaration of invalidity, noninfringement and unenforceability of the patent in suit. It was tried to the court [1] without the intervention of a jury.

Plaintiff Feed Service Corporation is a Nebraska corporation with its principal office and place of business near Crete, Nebraska. Defendant Kent Feeds, Inc., has a place of business at Rockford, Illinois, and is wholly owned and controlled by defendant Grain Processing Corporation. Both defendants are Iowa corporations.

Plaintiff and defendant Kent Feeds, Inc., make and sell feeds and feed supplements for cattle. They are competitors in this business. Defendant Grain Processing Corporation makes and sells feed ingredients to Kent Feeds, Inc.

### I.

As disclosed in the '332 patent, "ruminants" include cattle, sheep, camels, goats, bison and other animals. The invention here is specifically exemplified in connection with its application to cattle.

One of the chief problems in raising cattle for meat production is to achieve the most economical utilization of feed ingested by the cattle. It normally requires about 2¾ years to raise a newborn calf to an animal of slaughter size. During part of this period, the cattle are fed naturally occurring but relatively expensive nitrogen-containing products, such as linseed oil. In addition to the disadvantage of higher costs, the use of such products involves an undesirable deterioration of the quality of land by the removal of the nitrogen-containing products.

Plaintiff began manufacturing a liquid feed for ruminants in 1951. For the first four years a restrictive combination of molasses, urea, phosphoric acid and water was used and was found to be unsatisfactory for commercial purposes. This product was known as the first generation liquid feed.

Over a period of about 2½ years Anderson and Rapp tried various materials in combination with urea, in searching

* Mr. Justice Stevens participated initially as Circuit Judge, and on and after December 19, 1975, as Circuit Justice.

1. The United States District Court for the Northern District of Illinois, the Honorable William J. Lynch, Judge, presiding.

for a commercially suitable liquid feed as efficient as an oil seed meal in producing gains in animals.

The invention in the '332 patent came to light when Anderson and Rapp conceived the idea of incorporating ethyl alcohol and a synthetic nitrogen source in feed supplements. They formulated feed supplements containing ethyl alcohol (sometimes referred to as "alcohol" or "ethanol") and urea as the source of synthetic nitrogen.

It was conceded that ethyl alcohol was well known and was present in distillery slop used in animal feeding. However, the inventors claimed that ethyl alcohol was not purposely incorporated in prior feed supplements to produce unexpected advantages as is the case with the patented invention.

Tests conducted by plaintiff demonstrated that the use of its formulated feed supplement, containing ethyl alcohol and urea as the source of synthetic nitrogen, enhanced the ability of the test animals to consume larger amounts of feed and to make better gains.

## II.

The file wrapper discloses that after the application for the patent in suit on February 17, 1955, it had a rather stormy career in the Patent Office. The Examiner rejected all claims on August 25, 1955, for a wide variety of reasons. On October 25, 1955, the applicants responded in an effort to meet the Examiner's reasons for rejection. After considerable sparring back and forth, the Examiner again rejected certain claims on December 11, 1956. The applicants responded, and, finally, on October 1, 1957, the patent was issued in its present and final form. It was a narrower patent than the one originally sought.

The '332 patent contains twenty-one claims, the first seven of which are process claims and the remainder are composition claims.

The inventors stated that "an object of our invention is the provision of a process and composition for use as a feed supplement in order to obtain maximum economic food production from the ruminants in minimum periods [and] * * * to increase the utilization by ruminants of materials such as synthetic nitrogenous materials, and cellulose and other inexpensive ruminant feed-stuffs."

Among other results claimed by using the present invention is a reduction in the processing period of cattle to fifteen months. The inventors further stated that the use of ethyl alcohol in this manner did not result in the cattle overeating, but that when cattle were fed free choice, they ate only such quantities of the feed supplement as could be utilized to yield optimum growth conditions, this being a surprising and unique result.

The patent in suit listed some nine requirements of any additives intended for incorporation in the feed. After a showing of the proper use of the claimed combination, seven examples, in which parts by weight were given, were listed to illustrate the invention. At the conclusion of a discussion of the science of nutrition, there followed the listing of the twenty-one claims.

Claims 11 and 16 are illustrative of the patent claims and read as follows:

11. A feed supplement for ruminants comprising urea and ethanol in an amount effective to increase the nitrogen-retention ability of ruminants, said amount being from about 1 to 12 parts by weight per 10 parts by weight of urea.

16. A feed supplement for ruminants comprising urea, phosphoric acid, molasses and ethanol in an amount effective to increase the nitrogen-retention ability of ruminants.

## III.

Trial of this action was held on December 2–5, 1974. Both inventors testified for plaintiff, together with Mr. Augustin, a farmer and cattle feeder for 35 years; Dr. Garrison, an officer of East Shore Chemical Company, Muskegon, Michigan; Mr. Billington, a partner in Kern Research Laboratories, Bakersfield,

California; and Dr. Dunn, of Bjorksten Research Laboratories, Inc., Madison, Wisconsin. Four witnesses testified for defendants: Dr. McDonald, Ruminant Nutritionist for Kent Feeds; Dr. Malzahn, Technical Director, and Dr. Kiser, Manager of Analytical Development, both of Grain Processing Corporation; and Dr. Burroughs, Professor of Animal Science at Iowa State University.

The trial court did not set any post-trial briefing schedule or request oral argument. On December 10, 1974, the court entered a judgment order in favor of plaintiff and requested the parties to submit proposed findings of fact and conclusions of law within ten days. This time was subsequently extended to February 7, 1975. Plaintiff submitted its proposed findings and conclusions on February 7, 1975. Defendants did not submit any findings and conclusions. On February 26, 1975, the court adopted plaintiff's proposed findings and conclusions as its own and rendered judgment in favor of plaintiff in this expanded form, but without any memorandum opinion. Defendants have timely appealed.

In sum, the trial court found and held (1) that plaintiff's '332 patent was valid; (2) that all twenty-one claims of the '332 patent were infringed by defendants by reason of their manufacture and sale of the accused feed supplement compositions; (3) that defendants' infringement of the patent was knowingly, willfully and wantonly done and entitled plaintiff to an award of treble damages, costs, expenses and attorneys' fees; and (4) that an accounting be had by the court to determine the damages, and a hearing be had to determine the amount of costs, expenses and attorneys' fees.

However they may be phrased, the issues before us on this appeal relate directly to the correctness of the trial court's actions in each of the foregoing findings and conclusions.

## IV.

At the outset we observe defendants' critical reference to the trial court's adoption in toto of the proposed findings and conclusions submitted by plaintiff and the absence of any memorandum opinion, and also the implied critical reference to the absence of any post-trial briefing or oral argument. We are fully cognizant of the shortcomings of these procedures and do not give them our unqualified blessing.

However, it must also be noted that defendants did not submit any proposed findings or conclusions, did not make objection to those submitted by plaintiff before their adoption by the court, and did not make objection to the post-trial procedure used by the court. In lieu thereof, defendants timely appealed. Hence, we take the case as we find it.

It appears to be well established that plaintiff was a relatively small newcomer in the feed supplement business. It began commercial exploitation of the invention in suit in April and May 1955. It sold its formulated liquid supplement under the trademark "Morea" and met with early commercial success. This is illustrated by the fact that between 1955 and 1973, a total of about 8,000,000 gallons of ethanol were used commercially in its patented Morea product. This amount of alcohol is the equivalent of over 400,000 tons of Morea liquid feed. Domestic cattle fed with Morea involved in this litigation were valued at from 1½ to 2 billion dollars. This was also shown to have been the total value, calculated on the basis of royalty income, of foreign cattle fed by plaintiff's foreign licensees.

At this juncture it should be observed that plaintiff secured forty-seven corresponding foreign patents on the same invention. These included patents from well known countries and are listed in the record. Only Brazil denied plaintiff's application, and it does not issue patents on feedstuffs.

The trial court found from the testimony of Mr. Augustin, a cattle feeder of 35 years experience, that for some years he had purchased from plaintiff the product hereinabove referred to as "first generation liquid feed"; that after trying out the Morea product, he stopped

using the prior first generation product; and that over a period of the past twelve years he purchased about $480,000 worth of Morea each year. Mr. Augustin testified that he secured greater weight gains and had a more satisfactory market for his cattle because there was a marbling through the meat instead of fat on the outside, resulting in a more palatable product.

The only reference cited in the patent in suit is an extract from an article by Winslow, Veterinary Materia Medica and Therapeutics 217 (8th ed. rev. 1919). The file wrapper indicates that the rejections because of Winslow were satisfied during the course of the proceedings in the Patent Office.

We deem it appropriate here to make specific reference to certain findings of fact by the trial court as they may be relevant to the question of validity of the '332 patent.[2]

16. The patented feed supplement is bottomed on the conjoint use of synthetic-nitrogen substances, e. g., urea, and ethanol, in a ratio such that cattle co-fed with it will have the property or ability to retain more nitrogen, i. e., the cattle will have increased true weight gains. The preferred ratio is from about 1 to 12 parts by weight of ethanol to 10 parts by weight of urea, or the equivalent of the latter. The combination of the specific amounts of urea and ethanol bring about synergistic results, i. e., the results are better than would be expected from the contributions of each of the ingredients, used separately.

17. The specification of the patent in suit contains a description of the invention in such full, clear, concise and exact terms as to enable the patented feed supplement to be made and used by those skilled in the art.

18. Those skilled in the art include cattle feeders and those in experimental stations who teach others to feed cattle. .

20. The claims of the patent in suit particularly point out and distinctly claim the patented feed supplement.

21. The term "nitrogen retention ability" has adequate basis in the specification as filed, and was understood by defendants and by defendants' counsel.

22. A nitrogen retention test is and was, at the time of filing the patent application, a measurement of true growth well known by technical workers in experiment stations and by defendants. Actual feeders refer to weight gain which in Augustin's commercial feedlots increased from an average daily gain of 2.7 pounds to an average of 3 pounds or better when the supplement embodied in the patent in suit was fed. The specification of the patent in suit also refers to the cattle making "good" gains and appearing healthy after being co-fed the patented feed supplement.

Based upon our examination of the record as a whole, we cannot say that these foregoing findings of fact are clearly erroneous in light of Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C., and in a patent case involving conflicting testimony as related to scientific problems. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 610, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

Defendants assert in substance that the trial court erred in holding the '332 patent valid because it did not follow the standards of determining obviousness pursuant to 35 U.S.C. § 103,[3] as required

2. Record page references and citations are omitted.

3. 35 U.S.C. § 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

by *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). This oft-quoted reference reads:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

We must reject defendants' contention. A reading of findings 58–60 leads to finding 61:

61. The Court, after determining the scope and content of the prior art, ascertaining the differences between the prior art and the claims at issue, and resolving the level of ordinary skill in the art of making and using feed supplements for ruminants (cattle), finds that the claims in the patent in suit are all valid.

Then follow findings 62–86 which deal explicitly with all references to the prior art cited by defendants. In light of these findings of fact and our consideration of the record as a whole, we cannot say that the trial court erred in this respect. To the contrary, we find a faithful observance of the standards laid down in *John Deere* and in Section 103.

Defendants further assert that the trial court erred in holding the patent in suit valid without observing the standards of definiteness required by 35

U.S.C. § 112,[4] and particularly cite *Pambello v. Hamilton Cosco, Inc.*, 7 Cir., 377 F.2d 445 (1967). In that case the trial court found certain claims to be a "mass of vague, repetitive, and ambiguous verbiage," but nevertheless held such claims to be valid. *Id.* at 446. Our court agreed with the finding that the claims were vague and ambiguous and held them to be invalid under Section 112. We said further: "Section 112 requires, as a prerequisite to validity, that patent claims particularly point out and distinctly claim the subject matter which the applicant regards as his invention. Ambiguous, indefinite and vague patent claims are void." *Id.* at 447.

The dispute in the case at bar centers around a claimed ambiguity in the use of the phrase "nitrogen retention ability" in the patent claims without defining its meaning elsewhere in the patent and particularly in the specifications, as mentioned in Section 112.

Here there is no dispute about the proper scope and meaning of the phrase "nitrogen retention." Defendants focus on the use of the word "ability" therewith. The crux of the matter is whether the addition of the word "ability" somehow alters the meaning of the acceptable phrase "nitrogen retention." It appears from the record that there was conflicting evidence on this difference. The trial court accepted plaintiff's view. Since the tests for measuring "nitrogen retention" were concededly well known in the art, one wonders what obligation there was on the inventors to teach or describe the art already known.

In *Ellipse Corporation v. Ford Motor Company*, 7 Cir., 452 F.2d 163, 167 (1971), *cert. denied*, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972), we held that in determining the scope and meaning of patent claims they should "be construed

---

4. 35 U.S.C. § 112 provides in relevant part:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly con-

nected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

in the light of the specifications and both are to be read with a view to ascertaining the invention * * * [and a] patentee can choose his own terms and use them as he wishes so long as he remains consistent in their use and makes their meaning reasonably clear." (Citations omitted.) Further in *Ellipse*, in answering the specific contention made here by defendants, the court said: "However, Section 112 is satisfied where the patentee reasonably discloses the subject matter of the invention in terms which are reasonably clear and consistent. The patentee is his own lexicographer." *Id.* at 170.

We find that the trial court did not err in holding the patent in suit valid in this respect, but in fact properly applied Section 112 to the case at bar.

It has not been shown that there is anything in the prior art disclosing the composition of alcohol and urea as taught in the patent in suit. This appears to be the classic case of a combination of two elements old in the art which produced a new and useful result. In this respect it is a narrowly construed patent and must necessarily be so.

■ In light of the foregoing resolutions, together with the showing of commercial success, we have no difficulty in finding that the patent in suit is valid as to all of its claims and we so hold.

## V.

Defendants urge that the trial court erred in finding that the applicants for the patent in suit did not misrepresent or conceal from the Patent Office any relevant prior art which they knew of during the prosecution of their patent application. In short, defendants charge a complete lack of candor.

This charge arises from the use of the following statement in the '332 patent: "However, though we have made diligent search therefor, we have failed to find any suggestion that the common ethanol could be incorporated in feed supplements for ruminants with its consequent unexpected advantages."

Defendants charge plaintiff with failure to call to the attention of the Patent Office certain prior art discovered by plaintiff's searcher prior to the filing of the patent application. Defendants claim this art dealt with "ethyl alcohol in animal feeds."

It appears that none of the references in question disclose the concept of using urea and ethanol in feedstuffs in accordance with the claims. The trial court properly pointed out the differences between the patent in suit and Defendants' Exhibits 27, 28, 31 and 32 in its findings Nos. 75, 76, 79 and 80. Defendants did not rely on these four exhibits in challenging the validity of the patent for alleged obviousness. Plaintiff contends that, with one exception, it knew of these prior art references but did not consider them relevant to anything beyond what the patent itself stated.

A further charge is leveled by defendants because of plaintiff's failure to call the Patent Office's attention to the German article by one Pott entitled "Manual of Animal Feeding and Agricultural Feeds." The article relates, *inter alia*, to the use of alcohol in animal feedstuffs. In fact, it teaches against its excessive use.

Plaintiff translated and published the Pott article for public consumption. No attempt was made to conceal it. The German Patent Office cited Pott against the plaintiff's German application but granted the patent upon a showing that it was not pertinent.

Our court in *Wen Products, Inc. v. Portable Electric Tools, Inc.*, 7 Cir., 367 F.2d 764, 767 (1966), held that there was no "unclean hands" on the part of the applicant-patentee for failure to disclose a prior art patent that "did not embody the inventions of the claims in suit." And in *Scott Paper Company v. Fort Howard Paper Company*, 7 Cir., 432 F.2d 1198, 1204 (1970), *cert. denied*, 401 U.S. 913, 91 S.Ct. 882, 27 L.Ed.2d 812 (1971), we held that "unclean hands" or fraud must be based on "clear, unequivocal and convincing evidence"; and, further, that

"unclean hands" could be asserted "only if there has been a deliberate misrepresentation in the Patent Office."

■ We have considered the various charges of "lack of candor" against plaintiff and, in light of the criteria established by our court, we find them unconvincing. The trial court did not prejudicially err in finding that there was no lack of candor in plaintiff's dealings with the Patent Office.

## VI.

The question of infringement poses a more difficult problem. The trial court found that all twenty-one claims of the patent in suit were infringed by defendants' accused product. The accused product was marketed under the copyright trade name of "Bovino" and was to be used in conjunction with Kent's FM–32 Complement.

As shown in Plaintiff's Exhibit 11, which is defendants' brochure on the product, Bovino is a fermented molasses product whose ingredients are fermented molasses, cane (blackstrap) molasses, corn distillers solubles, corn steepwater, ammonium polyphosphate, urea, ammonium sulphate and salt. In making Bovino, cane molasses is fermented through the addition of yeast and heat to produce an end product containing alcohol and molasses fermentation solubles.

Defendants' brochure claims that Bovino is a "revolutionary beef feeding breakthrough" in that it features the use of fermented molasses for faster rate of gain, better feed efficiency, improved carcass quality and higher returns and profits. It is shown that Bovino is not a complete liquid supplement, and that it should be fed with FM–32 Complement, which contains all the additional nutrients and growth factors needed. The components and guaranteed analysis are set out. Methods of feeding and results of research are indicated. Agitation of the product is required.

A later development, "Bovino-Lac" products, are shown to be complete liquid supplements made from a base of

Bovino with the benefit of fermented molasses and requiring the feeding of additional calcium after agitation. Further shown are cattle liquid feed supplements 32 and 44 made from unfermented molasses, which are well suited for lick tanks.

The fact that the fermentation process of the blackstrap molasses converts virtually all of the sugar in the molasses to alcohol and then is followed by the other additives, including urea, gives rise to the basic claim of infringement.

As hereinabove pointed out, the novelty of the patent in suit was the conception of the idea of incorporating ethyl alcohol and a synthetic nitrogen source in feed supplements. This led to the formulation of feed supplements containing ethyl alcohol and urea as the source of synthetic nitrogen. As plaintiff's claim 11 states, the feed supplement comprises urea and ethanol in an amount effective to increase the nitrogen-retention ability of ruminants in an amount of about 1 to 12 parts of ethanol by weight per 10 parts by weight of urea. Claim 16 describes a feed supplement comprising urea, phosphoric acid, molasses and ethanol in an amount to increase the nitrogen-retention ability of ruminants.

■ We do not read the claims in suit to be broad enough to cover all feed supplements containing urea and ethanol no matter how the alcohol is obtained. We read the claims to teach the use of alcohol in its liquid form and not the use of alcohol derived in a fermentation process of molasses or from other fermented sources. Although plaintiff strenuously argues to the contrary, we incline to the more narrow view that the '332 patent in suit covers the *addition* of alcohol as such to its claimed combination. We cannot say that its monopoly extends to the mere presence of alcohol resulting from a molasses fermentation process.

Plaintiff concedes on brief that the process claims (1 to 8) call for "incorporating" ethanol in feed for ruminants.

However, they assert that the composition claims (9 to 21) are not limited as to the manner in which ethanol is incorporated into the feed supplement. In the court's findings Nos. 41–45, plaintiff seeks to demonstrate that the accused product, however composed, accomplishes the same results as those specified for Morea in claims 11–16 of their patent.

We have noted the variety of tests relating to nitrogen-retention ability, the literature dealing with the various aspects of the use of alcohol in feed supplements for ruminants and the cattle testing engaged in by both parties, together with the testimony of the witnesses relating to the question of infringement. It all adds up to a determination of a close question of infringement.

Certain things have become crystal clear to us at this time. In our considered judgment the plaintiff is limited to a narrow construction of the patent in suit. Defendants do not *add* alcohol to their feed supplements and plaintiff does not charge them with that. The charge of infringement is based on the use by defendants of fermented molasses which provides the alcohol in question as a natural occurring event. We have concluded that the patent in suit is limited to the teaching of the *addition* of alcohol in feed supplements. The fact that the defendants' Bovino product may reach the same result as plaintiff's Morea is not conclusive of the determination of infringement. It is all a far cry from plaintiff's overzealous charge of blatant infringement, literal piracy and outright duplication.

We hold that the trial court erred in finding that defendants infringed the patent in suit.

In view of our holding of noninfringement, we do not reach the question of the award of treble damages and attorneys' fees.

---

Based on the foregoing, the judgment of the district court finding the patent in suit to be valid and enforceable is affirmed; the judgment finding the patent in suit to be infringed and the award of treble damages and attorneys' fees is reversed. It is ordered that each party shall bear its own costs.

Affirmed in part.

Reversed in part.

STEVENS, Circuit Justice (dissenting in part):

Although I would not sustain the award of treble damages and attorneys' fees, I am not persuaded that the finding of infringement is clearly erroneous. I agree with Judge Hastings' conclusions that the patent is valid and that the claims only cover the addition of alcohol in feed supplements, but it seems to me that the incorporation of fermented molasses is a method of adding ethanol.